# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANUVU CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| INTELLECTUAL VENTURES I LLC and | ) | **JURY TRIAL DEMANDED** |
| INTELLECTUAL VENTURES II LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Anuvu Corp. ("Anuvu") seeks a declaratory judgment that Anuvu does not directly or indirectly infringe United States Patent No. 8,027,326 nor Patent No 7,324,469, as follows:

## NATURE OF THE ACTION

1.      This is an action for a declaratory judgment of non-infringement arising under the patent laws of the United States, Title 35 of the United States Code. Anuvu requests this relief because defendants Intellectual Ventures I LLC and Intellectual Ventures II LLC have recently filed lawsuits against Anuvu's customer claiming that Anuvu's in-flight connectivity systems infringe U.S. Patent Nos. 8,027,326 and 7,324,469 (the "IV Patents"). This litigation campaign directly accuses Anuvu's products of patent infringement, impacting Anuvu's business and relationships with its customer, and creating a justiciable controversy between Anuvu and Intellectual Ventures I LLC and Intellectual Ventures II LLC.

## THE PARTIES

2.      Plaintiff Anuvu is a global connectivity and entertainment corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1000 Oak Creek Drive, Lombard, Illinois 60148. Anuvu has significant expertise in connectivity and

entertainment for mobility markets. Among other products and services, Anuvu provides in-flight connectivity systems to airline customers, which allow airline passengers to access the Internet, according to the airline's policies and procedures.

3.	Defendant Intellectual Ventures I LLC ("Intellectual Ventures I") is a limited liability company organized and existing under the laws of the State of Delaware, with a claimed principal place of business at 3150 139th Avenue SE, Bellevue, Washington, 98005.

4.	Intellectual Ventures I alleges that it is "the owner of all rights, title, and interest in and to" U.S. Patent No. 8,027,326 (the "'326 patent"), attached as Exhibit 1. *Intellectual Ventures I LLC v. Southwest Airlines Co.*, No. 24-277, D.I. 1 ¶¶ 4, 33 (W.D. Tex. Nov. 2, 2024).

5.	Defendant Intellectual Ventures II LLC ("Intellectual Ventures II") is a limited liability company organized and existing under the laws of the State of Delaware, with a claimed principal place of business at 3150 139th Avenue SE, Bellevue, Washington, 98005.

6.	Intellectual Ventures II alleges that it is "the owner of all rights, title, and interest in and to" United States Patent No. 7,324,469 (the "'469 patent"), attached as Exhibit 2. *I.V. v. Southwest*, *supra*, D.I. 1 ¶¶ 5, 35.

## JURISDICTION AND VENUE

7.	This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and under the patent laws of the United States, 35 U.S.C. §§ 1-390.

8.	This Court has subject matter jurisdiction over this action under at least 28 U.S.C. §§ 1331, 1338(a), and 2201(a). An actual, substantial, immediate, and continuing controversy exists between Anuvu and Intellectual Ventures I that requires a declaration of rights by this Court regarding the '326 patent, and between Anuvu and Intellectual Ventures II that requires a declaration of rights by this Court regarding the '469 patent.

9.  The litigation brought by Intellectual Ventures I and Intellectual Ventures II against Southwest Airlines Co. ("Southwest") directly accuses Anuvu's in-flight connectivity systems of patent infringement, impacting Anuvu's business and relationships with its customers.  An actual case and controversy exists at least because Anuvu does not infringe and has not infringed any of the claims of the IV Patents and Defendants have accused Southwest of infringing the IV Patents through products or services that Anuvu provides to Southwest.  Defendants' actions have created a real, live, immediate, and justiciable case or controversy between Defendants and Anuvu. Defendants have taken the affirmative act to enforce its patent rights by explicitly alleging Southwest and Anuvu are infringing Defendants' patents.  Anuvu understands, and alleges upon information and belief, that Defendants are attempting to assert or license the IV Patents against others as well—which likely include companies that are Delaware corporations.

10.  This Court has general personal jurisdiction over Intellectual Ventures I under the laws of the State of Delaware and consistent with the underlying due process principles of the United States Constitution because Intellectual Ventures I is a limited liability company organized and existing under the laws of the State of Delaware.

11.  This Court has general personal jurisdiction over Intellectual Ventures II under the laws of the State of Delaware and consistent with the underlying due process principles of the United States Constitution because Intellectual Ventures II is a limited liability company organized and existing under the laws of the State of Delaware.

12.  Venue is proper in this District under at least 28 U.S.C. §§ 1391(b), (c), because Intellectual Ventures I and Intellectual Ventures II are residents of this District.

## THE '326 PATENT

13.  On July 18, 2011, Intellectual Ventures I acquired U.S. Patent Application No. 11/033,524 from Callahan Cellular L.L.C.

14. On September 27, 2011, the United States Patent and Trademark Office issued the '326 patent from Application No. 11/033,524, entitled "Method and System for High Data Rate Multi-Channel WLAN Architecture." Ex. 1.

15. The '326 patent concerns "a system and method for high data rate multi-channel wireless communications." Ex. 1 at 1:15-17. The patent contemplates "a way to achieve very high data rate expanded bandwidth (wide band) WLAN operations reusing existing single channel radio designs" that "provides a dual-channel form of operation for greater flexibility and performance across multiple platforms." *Id*. at 7:59-63. Claim 1 recites:

> A method for increasing data rates and data throughput in a network, the method comprising:
>
> selecting at least a first channel and a second channel, wherein the first channel and the second channel are adjacent without any other channels there between, wherein the first channel and the second channel each have a plurality of data subcarriers, wherein the data subcarriers of the first channel and the data subcarriers of the second channel are separated by a frequency gap corresponding to one or more guard bands between the first and second channels;
>
> partially filling the frequency gap between the first channel and the second channel by adding one or more data subcarriers into the frequency gap such that the one or more guard bands are at least partially filled with at least some of the one or more data subcarriers using full spectral synthesis capability of a fast fourier transform or an inverse fast fourier transform;
>
> combining the first channel and the second channel using channel bonding with orthogonal frequency division multiplexing (OFDM); and transmitting data subcarriers occupying the first channel, the second channel, and the frequency gap in parallel to a receiver.

*Id*. at 17:26-49.

16. During prosecution, the Examiner rejected all pending claims of what would become the '326 patent six times, on July 7, 2008; January 26, 2009; July 7, 2009; January 26, 2010; July 20, 2010; and December 27, 2010.

4

17.     According to a Notice of Allowance for the '326 patent, attached as Exhibit 3, the Examiner held telephone interviews with the applicant's representative on May 6 and May 9, 2011, during which the Examiner proposed an Examiner's amendment to the pending independent claims. *See* Ex. 3 at 6. The applicant accepted this amendment. *Id.*

18.     On May 16, 2011, the Examiner issued the Notice of Allowance including the Examiner's amendment, which added to each independent claim the requirement that the "one or more guard bands are at least partially filled with at least some of the one or more data subcarriers *using full spectral synthesis capability of a fast fourier transform or an inverse fast fourier transform.*" *Id.* (emphasis in original).

19.     Thus, following the Examiner's amendment, claim 1 requires "partially filling the frequency gap between the first channel and the second channel by adding one or more data subcarriers into the frequency gap such that the one or more guard bands are at least partially filled with at least some of the one or more data subcarriers *using full spectral synthesis capability of a fast fourier transform or an inverse fast fourier transform.*"

20.     A Fourier transform is an integral transform that can take a time-domain function as input and output a frequency-domain function showing the extent of spectral components present in the original time-domain function.

21.     A time-domain function characterizes the variation of a signal with respect to time, while a frequency-domain function characterizes the variation of a signal with respect to frequency. A time-domain signal can be converted into a frequency-domain signal by a Fourier transform, and a frequency-domain signal can also be converted into a time-domain signal by an inverse Fourier transform. The same signal can be uniquely represented with a time-domain function or with a frequency-domain function.

22. A fast Fourier transform converts a finite sequence of signal samples in one domain, such as the discrete time domain, into a sample sequence in the frequency domain. Similarly, an inverse fast Fourier transform converts a finite sequence of discrete samples in the frequency domain into a sample sequence in the discrete time domain.

23. An engineer will choose whether or not to use a fast Fourier transform depending on whether it is suitable for the task. Using a fast Fourier transform has advantages and disadvantages. One disadvantage of the fast Fourier transform is that it cannot provide output that is continuous in the time domain.

24. Thus, whether to use a fast Fourier transform instead of some other method of calculating a Fourier transform will depend, in part, on whether the output signal must be continuous in the time domain or may be discrete in the time domain.

## ANUVU DOES NOT INFRINGE THE '326 PATENT

25. In *I.V. v. Southwest*, Intellectual Ventures I alleges that Southwest infringes the '326 patent by using Anuvu's in-flight connectivity systems. *I.V. v. Southwest, supra*, D.I. 1 ¶¶ 87-101; *id.*, D.I. 1-11 *passim*. For the convenience of the Court, Anuvu attaches the complaint in *I.V. v. Southwest*, D.I. 1, as Exhibit 4, and the accompanying chart showing infringement allegations regarding the '326 patent, *I.V. v. Southwest*, D.I. 1-11, as Exhibit 5.

26. Further, in *I.V. v. Southwest*, Intellectual Ventures I accuses Anuvu's in-flight connectivity systems of infringement based on "complian[ce] with Wi-Fi 802.11n and 802.11ac protocols." *I.V. v. Southwest, supra*, D.I. 1-11 (Ex. 5) at 8; *see, e.g., id.* at 5, 7, 11-64.

27. But Intellectual Ventures I's allegations of infringement against Anuvu's in-flight connectivity systems are incorrect.

28. Intellectual Ventures I's infringement claims in *I.V. v. Southwest* depend on the IEEE 802.11n standard. Intellectual Ventures I alleges that Anuvu's in-flight connectivity systems

practice the IEEE 802.11n standard, *see generally I.V. v. Southwest*, *supra*, D.I. 1-11 (Ex. 5), and then states that "[o]n information and belief, IEEE 802.11ac infringes for the same reasons as 802.11n." *I.V. v. Southwest*, *supra*, D.I. 1-11 at 17 (Ex. 5).

29.     Intellectual Ventures I's infringement claims cite to and rely on "IEEE Standard 802.11n-2009." *E.g., id.* at 13, 15, 21, 23, 25, 27, 33, 34, 43, 44, 46, 47, 49, 56, 62.

30.     Intellectual Ventures I alleges that Anuvu's in-flight connectivity systems infringe what it calls element "[1.b]" of claim 1 of the '326 patent, which includes the Examiner's amendment: "partially filling the frequency gap between the first channel and the second channel by adding one or more data subcarriers into the frequency gap such that the one or more guard bands are at least partially filled with at least some of the one or more data subcarriers *using full spectral synthesis capability of a fast fourier transform or an inverse fast fourier transform*." *I.V. v. Southwest*, *supra*, D.I. 1-11 (Ex. 5) at 41-53.

31.     But Intellectual Ventures I cites no evidence showing that Anuvu's in-flight connectivity systems practice the IEEE 802.11n standard specifically.  At most, Intellectual Ventures I cites a cabin wireless local area network (LAN) (CWLU) in relation to "802.11a/b/g/n/ac standards," which includes multiple standards. *I.V. v. Southwest*, *supra*, D.I. 1-11 (Ex. 5) at 7. This citation does not show that Anuvu's in-flight connectivity systems practice the 802.11n standard specifically. Neither does it show that Anuvu's in-flight connectivity systems practice the 802.11ac standard specifically.

32.     Further, nothing cited by Intellectual Ventures I confirms that IEEE Standard 802.11n-2009 requires or even contemplates using "full spectral synthesis capability of a fast fourier transform or an inverse fast fourier transform" as required by the Examiner's amendment.

7

33.     Intellectual Ventures I acknowledges as much in its infringement claims, stating

that "*[o]n information and belief*, the HT PHY uses a 128-point IDFT, usually implemented as an

IFFT, to create the transmitted signal across the full 40 MHz signal spectrum. *This process involves*

*a fast fourier transform (FFT).*" *I.V. v. Southwest, supra*, D.I. 1-11 (Ex. 5) at 48 (emphasis added).

34.     But other portions of the IEEE Standard 802.11n-2009, the document on which

Intellectual Ventures I relies, confirm that Intellectual Ventures I's "information and belief"

allegation is incorrect, and that implementers of the standard cannot use "full spectral synthesis

capability of a fast fourier transform or an inverse fast fourier transform" to send and receive the

"one or more data subcarriers" as required by the Examiner's amendment.

35.     For example, Intellectual Ventures I alleges that Anuvu's in-flight connectivity

systems infringe what it calls element "[1.c]" of claim 1 of the '326 patent by "combining the first

channel and the second channel using channel bonding with orthogonal frequency division

multiplexing (OFDM)," and supports this allegation by citation to Section 20.3.11.10.3 of IEEE

Standard 802.11n-2009, which reads as follows:

**20.3.11.10.3 Transmission in 40 MHz HT format**

For 40 MHz HT transmissions, the signal from transmit chain $i_{TX}$ shall be as shown in Equation (20-59).

$$r_{HT-DATA}^{i_{TX}}(t) = \frac{1}{\sqrt{N_{STS} \cdot N_{HT-DATA}^{Tone}}} \sum_{n=0}^{N_{SYM}-1} w_{T_{SYM}}(t-nT_{SYM})$$

$$\cdot \sum_{k=-N_{SR}}^{N_{SR}} \sum_{i_{STS}=1}^{N_{STS}} ([Q_k]_{i_{TX}, i_{STS}} (\tilde{D}_{k, i_{STS}, n} + p_{n+z} P_{(i_{STS}, n)}^k)) \Upsilon_k \quad (20\text{-}59)$$

$$\cdot \exp(j2\pi k \Delta_F (t - nT_{SYM} - T_{GI} - T_{CS}^{i_{STS}})))$$

*I.V. v. Southwest, supra*, D.I. 1-11 (Ex. 5) at 55.

36.     Equation (20-59) specifies output from an inverse Fourier transform of the data signal into a signal $r^{itx}_{HT\text{-}DATA}(t)$ in continuous time domain, and uses continuous time "t" to denote and generate the transmission signal $r^{itx}_{HT\text{-}DATA}(t)$.

37.     A fast Fourier transform cannot provide output that is continuous in the time domain, and thus cannot provide the "*t*" specified by equation (20-59).

38.     In addition, Section 20.3.11.10.4 of IEEE Standard 802.11n-2009 specifies transmission in MCS 32 format at 40 MHz:

### 20.3.11.10.4 Transmission in MCS 32 format

MCS 32 format provides the lowest transmission rate in 40 MHz. It is used only for one spatial stream and only with BPSK modulation and rate 1/2 coding.

In the MCS 32 format, the signal shall be as shown in Equation (20-60).

$$
\begin{aligned}
r^{i_{TX}}_{HT-DATA}(t) = {} & \frac{1}{\sqrt{N^{Tone}_{HT-Duplicate}}} \sum_{n=0}^{N_{SYM}-1} w_{T_{SYM}}(t-nT_{SYM}) \\
& \cdot \sum_{k=-N_{SR}}^{N_{SR}} (D_{k,n}+p_{n+z}P_k)([Q_{k-32}]_{i_{TX},1}\exp(j2\pi(k-32)\Delta_F(t-nT_{SYM}-T_{GI})) \\
& + j[Q_{k+32}]_{i_{TX},1}\exp(j2\pi(k+32)\Delta_F(t-nT_{SYM}-T_{GI})))
\end{aligned}
\qquad (20\text{-}60)
$$

39.     Equation (20-60) specifies output from an inverse Fourier transform of the data signal into a signal $r^{itx}_{HT\text{-}DATA}(t)$ in continuous time domain, and uses continuous time "t" to denote and generate the transmission signal $r^{itx}_{HT\text{-}DATA}(t)$.

40.     A fast Fourier transform cannot provide output that is continuous in the time domain, and thus cannot provide the "*t*" specified by equation (20-60).

41.     Equations (20-59) and (20-60) are the only equations in IEEE Standard 802.11n-2009 showing a signal for a 40 MHz transmission.

42. Intellectual Ventures I only accuses 40 MHz transmissions of infringement. *I.V. v. Southwest*, *supra*, D.I. 1-11 (Ex. 5) at 48.

43. IEEE Standard 802.11n-2009, including sections of the standard that Intellectual Ventures I cites to show infringement, actually confirms the opposite: to be "compliant with Wi-Fi 802.11n and 802.11ac protocols" as Intellectual Ventures I alleges, *e.g.*, *I.V. v. Southwest*, *supra*, D.I. 1-11 (Ex. 5) at 8, Anuvu's in-flight connectivity systems cannot practice the element of "partially filling the frequency gap between the first channel and the second channel by adding one or more data subcarriers into the frequency gap such that the one or more guard bands are at least partially filled with at least some of the one or more data subcarriers *using full spectral synthesis capability of a fast fourier transform or an inverse fast fourier transform*."

44. For these and other reasons, Anuvu's in-flight connectivity systems cannot and do not directly or indirectly infringe any claim of the '326 patent, literally or under the doctrine of equivalents.

45. Anuvu has not infringed and does not infringe any claim of the '326 patent either directly, contributorily, or by inducement, literally or under the doctrine of equivalents, including through its making, use, importation into the United States, sale, or offer for sale of the accused in-flight connectivity systems, or any Anuvu products.

## ANUVU CANNOT INFRINGE THE '326 PATENT BECAUSE ANY CLAIM IS EXHAUSTED

46. Anuvu cannot infringe the '326 patent because any claim is exhausted. Under the doctrine of patent exhaustion, when a licensee sells a product that practices or substantially embodies the patent, any claim of infringement arising from post-sale uses is exhausted through that sale.

47.     Regarding the '326 patent, Intellectual Ventures I's allegations of infringement depend on "complian[ce] with Wi-Fi 802.11n and 802.11ac protocols," *e.g.*, *I.V. v. Southwest*, *supra*, D.I. 1-11 (Ex. 5) at 8, and do not accuse any other portion of Anuvu's in-flight connectivity systems.

48.     In building in-flight connectivity systems, Anuvu exclusively uses at least wireless access point cards, which Intellectual Ventures I accuses of infringement, originally sold by Extreme Networks, Inc.

49.     On information and belief, in 2023 Intellectual Ventures I entered into an intellectual property license agreement with Extreme Networks, Inc.

50.     For example, Intellectual Ventures I sued Extreme Networks, Inc. for alleged patent infringement in the District of Delaware on May 4, 2023 (CA#: 1:23-cv-00489-JNR). For the convenience of the Court, Anuvu attaches the complaint in *I.V. v. Extreme Networks*, D.I. 1, as Exhibit 6. Intellectual Ventures I alleged there that Extreme Networks' various products that comply with the IEEE 802.11ac standard, including its wireless access point, infringed Intellectual Ventures I's patent. *E.g.*, Ex. 6, ¶ 27. However, soon thereafter, Intellectual Ventures I voluntarily dismissed that suit with prejudice on August 8, 2023.

51.     Further, on information and belief, the license agreement between Intellectual Ventures I and Extreme Networks, Inc. included a license to multiple (or all) of Intellectual Ventures I's patents, including the '326 patent, that covers all sales of accused wireless access point cards from Extreme Networks, Inc.

52.     As a result, each sale of an accused wireless access point card from Extreme Networks was authorized by the patentee, causing application of the patent exhaustion doctrine and preventing Intellectual Ventures I from asserting further patent rights or exclusionary power

over that article, exhausting Intellectual Ventures I's right to pursue any infringement claims under the '326 patent.

53.    Thus, Anuvu's in-flight connectivity systems cannot infringe any claim of the '326 patent because the licensed sale by Extreme Networks, Inc. exhausted Intellectual Ventures I's patent rights and extinguished any infringement claims.

**THE '469 PATENT**

54.    On January 29, 2008, the United States Patent and Trademark Office issued the '469 patent, entitled "Satellite Distributed High Speed Internet Access." Ex. 2.

55.    On September 26, 2024, Intellectual Ventures II acquired the '469 patent from Callahan Cellular L.L.C.

56.    The '469 patent "provides rural 'Hotspots'" for use "in areas that experience high volume transient traffic, such as rest areas, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges." Ex. 2 at 1:41-44. Its claim 24 recites:

An Internet Hotspot comprising:

a satellite dish communicating with the Internet via one or more data links with a satellite;

at least one router operatively coupled to the satellite dish;

a subscriber access unit operatively coupled between the satellite dish and the at least one router, the subscriber access unit being capable of authenticating a subscription account associated with a user prior to allowing the user access to the Internet; and

a web-ready device operatively coupled to the at least one router, the web-read device having a browser application operating thereon for accessing the Internet;

wherein the satellite dish, at least one router and the subscriber access unit are located in a remote location a [sic] experiencing a relatively high volume of transient traffic;

> wherein the user may authenticate the subscription account and access the Internet at the remote location by establishing a data connection between the web-ready device and the router.

*Id*. at 8:24-43. The '469 patent thus claims a system in which, among other things, authentication must occur locally, performed by a "subscriber access unit being capable of authenticating a subscription account associated with a user prior to allowing the user access to the Internet," that is "coupled between the satellite dish and the at least one router," and further requiring that the "the satellite dish, at least one router and the subscriber access unit are located in a remote location a [sic] experiencing a relatively high volume of transient traffic." *Id*.

## ANUVU DOES NOT INFRINGE THE '469 PATENT

57.     In *I.V. v. Southwest*, Intellectual Ventures II alleges that Southwest infringes the '469 patent by using Anuvu's in-flight connectivity systems. *I.V. v. Southwest*, *supra*, D.I. 1 (Ex. 4) ¶¶ 103-117; *id*., D.I. 1-12 *passim*. For the convenience of the Court, Anuvu attaches the chart accompanying the complaint in *I.V. v. Southwest* showing infringement allegations regarding the '469 patent, *I.V. v. Southwest*, D.I. 1-12, as Exhibit 7.

58.     In *I.V. v. Southwest*, Intellectual Ventures II accuses Anuvu's in-flight connectivity systems of infringement based on, among other things, the presence of what it calls element "[24.c]" of claim 24 of the '469 patent which recites "a subscriber access unit operatively coupled between the satellite dish and the at least one router, the subscriber access unit being capable of authenticating a subscription account associated with a user prior to allowing the user access to the Internet." *I.V. v. Southwest*, *supra*, D.I. 1-12 (Ex. 7) at 14; *see id*. at 14-17. Intellectual Ventures II makes this allegation "[o]n information and belief." *Id*. at 14.

59.     In *I.V. v. Southwest*, Intellectual Ventures II claims that, "[o]n information and belief, Southwest passengers authenticate themselves on the SouthwestWiFi.com web portal to

access in-flight Wi-Fi using on-board server(s). The authentication completes when the user enters

their login credentials on the portal." *Id.* at 16.

60.　　But Intellectual Ventures II's allegations of infringement against Anuvu's in-flight

connectivity systems are incorrect.

61.　　Notably, for claim element [24.c], Intellectual Ventures II cites no Anuvu

documents or materials whatsoever to support its infringement allegations. *See id.* at 14-17.

62.　　This is not surprising given that Anuvu's in-flight connectivity systems are not

"capable of authenticating a subscription account" "using on-board server(s)" in an aircraft, as

Intellectual Ventures II alleges. To the extent any "authenticat[ion]" of a "subscription account" is

performed, it is performed on the ground by terrestrial system(s), not performed by any on-board

server(s) nor any subscriber access unit in the aircraft.

63.　　For at least the above reasons, Anuvu's in-flight connectivity systems cannot and

do not include "a subscriber access unit operatively coupled between the satellite dish and the at

least one router, the subscriber access unit being capable of authenticating a subscription account

associated with a user prior to allowing the user access to the Internet."

64.　　Further, Anuvu's in-flight connectivity systems cannot and do not practice what

Intellectual Ventures II calls element [24.e] of claim 24 of the '469 patent which recites: "wherein

the satellite dish, at least one router and the subscriber access unit are located in a remote location

a experiencing a relatively high volume of transient traffic." Ex. 2 at 8:28-39.

65.　　Based on its plain wording, claim element [24.e] is indefinite since the meaning of

the phrase "a remote location **a** experiencing a relatively high volume of transient traffic" is facially

unclear. Ex. 4 at 8:37-38 (emphasis added). Intellectual Ventures II had the chance to, but did not,

file a Certificate of Correction for the '469 patent. *Compare* Ex. 1 at 65 (Certificate of Correction

for the '326 Patent) *with* Ex. 2 (no Certificate of Correction for the '469 patent). The Federal Circuit "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). Anuvu cannot and does not infringe a facially indefinite, and thus invalid, claim.

66.     To the extent Intellectual Ventures II argues claim element [24.e] is not indefinite, Anuvu nevertheless does not practice it at least because Anuvu has no in-flight connectivity system wherein the satellite dish, at least one router and the subscriber access unit are located in a remote location a experiencing a relatively high volume of transient traffic.

67.     For these and other reasons, Anuvu's in-flight connectivity systems do not directly or indirectly infringe any claim of the '469 patent, literally or under the doctrine of equivalents.

68.     Anuvu has not infringed and does not infringe any claim of the '469 patent either directly, contributorily, or by inducement, literally or under the doctrine of equivalents, including through its making, use, importation into the United States, sale, or offer for sale of the accused in-flight connectivity systems, or any Anuvu products.

## COUNT I

*(Declaration of Non-Infringement of the '326 Patent)*

69.     Anuvu restates and incorporates by reference the allegations in paragraph 1 through 68 of this Complaint as if fully set forth herein.

70.     Intellectual Ventures I claims to own all right, title, and interest in the '326 patent.

71.     Anuvu and its products, including Anuvu's in-flight connectivity systems, do not and did not directly or indirectly infringe any claim of the '326 patent, literally or under the doctrine of equivalents.

15

72.     An actual, substantial, immediate, and continuing controversy exists between Anuvu and Intellectual Ventures I regarding whether Anuvu infringes or has infringed the '326 patent. A judicial declaration is necessary and appropriate to determine the parties' rights regarding the '326 patent.

## COUNT II

*(Declaration of Non-Infringement of the '326 Patent Based on Exhaustion)*

73.     Anuvu restates and incorporates by reference the allegations in paragraph 1 through 72 of this Complaint as if fully set forth herein.

74.     Intellectual Ventures I claims to own all right, title, and interest in the '326 patent.

75.     Intellectual Ventures I's infringement allegations against Anuvu's in-flight connectivity systems are barred by the doctrine of patent exhaustion.

76.     Anuvu and its products, including Anuvu's in-flight connectivity systems, do not and did not directly or indirectly infringe any claim of the '326 patent, literally or under the doctrine of equivalents.

77.     An actual, substantial, immediate, and continuing controversy exists between Anuvu and Intellectual Ventures I regarding whether Anuvu infringes or has infringed the '326 patent. A judicial declaration is necessary and appropriate to determine the parties' rights regarding the '326 patent.

## COUNT III

*(Declaration of Non-Infringement of the '469 Patent)*

78.     Anuvu restates and incorporates by reference the allegations in paragraph 1 through 77 of this Complaint as if fully set forth herein.

79.     Intellectual Ventures II claims to own all right, title, and interest in the '469 patent.

80.     Anuvu and its products, including Anuvu's in-flight connectivity systems, do not and did not directly or indirectly infringe any claim of the '469 patent, literally or under the doctrine of equivalents.

81.     An actual, substantial, immediate, and continuing controversy exists between Anuvu and Intellectual Ventures II regarding whether Anuvu infringes or has infringed the '469 patent. A judicial declaration is necessary and appropriate to determine the parties' rights regarding the '469 patent.

## PRAYER FOR RELIEF

WHEREFORE, Anuvu prays for judgment and relief as follows:

A.     A declaration that Anuvu does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '326 patent;

B.     A declaration that Intellectual Ventures I's allegations of infringement of the '326 patent are barred by the doctrine of patent exhaustion;

C.     A declaration that Anuvu does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '469 patent;

D.     Judgment in favor of Anuvu and against Intellectual Ventures I and Intellectual Ventures II on Anuvu's claims;

E.     Finding that this an exceptional case under 35 U.S.C. § 285;

F.     Awarding Anuvu its costs and attorneys' fees in connection with this action; and

G.     Such further and additional relief as the Court deems just and proper.

## JURY DEMAND

Anuvu demands a jury trial on all issues and claims so triable.

Dated: January 30, 2025

Respectfully submitted,

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, Delaware 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com

Of Counsel:
M. Brett Johnson (*pro hac vice to be filed*)
mbjohnson@winston.com
Ahtoosa A. Dale (*pro hac vice to be filed*)
adale@winston.com
Chaoxuan Charles Liu (*pro hac vice to be
filed*)
ccliu@winston.com
Zoe A. Goldstein (*pro hac vice to be filed*)
zgoldstein@winston.com
WINSTON & STRAWN LLP
2121 North Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500

*Attorneys for Plaintiff Anuvu Corp.*