**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **INTELLECTUAL VENTURES I LLC and** | § | |
| **INTELLECTUAL VENTURES II LLC,** | § | |
| | § | |
| *Plaintiffs*, | § | **Civil Action No. 7:24-cv-00277-ADA** |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| **SOUTHWEST AIRLINES CO.,** | § | |
| | § | |
| *Defendant.* | § | |

---

**DEFENDANT SOUTHWEST AIRLINES CO.'S**
**RULE 12(b)(6) MOTION TO DISMISS**

---

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II. ARGUMENTS...................................................................................................... 1

    A.  Invalidity Under 35 U.S.C § 101 and *Alice* ........................................... 1

        1.  U.S. Patent No. 7,257,582 on First-Come/First-Serve Processing ............ 2

            a.  Claim 1 Is Directed to an Abstract Queue Management Technique. ................................................................................. 3

            b.  Claim 1 Lacks an Inventive Concept. .............................. 5

        2.  U.S. Patent No. 8,352,584 on Outsourced Computer Clusters ................. 6

            a.  Claim 1 Is Directed to a Business Idea. ........................... 8

            b.  Claim 1 Lacks an Inventive Concept. .............................. 9

        3.  U.S. Patent Nos. 8,332,844 and 7,721,282 on Root-Leaf Storage........... 11

            a.  Claims 1 and 7 Are Directed to Organizing and Storing Information. ................................................................. 13

            b.  Claims 1 and 7 Lack an Inventive Concept. ................... 14

    B.  Presuit Damages Are Not Available ....................................................... 16

    C.  No Infringing Uses Are Alleged ............................................................ 18

III. CONCLUSION................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Addiction & Detox. Inst. L.L.C. v. Carpenter,*
    620 F. App'x 934 (Fed. Cir. 2015) ...........................................................18, 19

*Affinity Labs of Tex., LLC v. DIRECTV, LLC,*
    838 F.3d 1253 (Fed. Cir. 2016)...............................................................3, 4

*Alice Corp. v. CLS Bank Int'l,*
    573 U.S. 208 (2014).......................................................... *passim*

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.,*
    876 F.3d 1350 (Fed. Cir. 2017)................................................................16

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.,*
    950 F.3d 860 (Fed. Cir. 2020)................................................................17

*Artrip v. Ball Corp.,*
    735 F. App'x 708 (Fed. Cir. 2018) .........................................................19

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................1

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC,*
    827 F.3d 1341 (Fed. Cir. 2016)................................................................10

*Bell Atl. v. Twombly,*
    550 U.S. 544 (2007)................................................................1, 20

*Berkheimer v. HP Inc.,*
    881 F.3d 1360 (Fed. Cir. 2018)................................................................2

*Bot M8 LLC v. Sony Corp. of Am.,*
    4 F.4th 1342 (Fed. Cir. 2021) ................................................................18

*Bridge and Post, Inc. v. Verizon Commc'ns, Inc.,*
    778 F. App'x 882 (Fed. Cir. 2019) ..........................................................8

*BSG Tech. L.L.C. v. Buyseasons, Inc.,*
    899 F.3d 1281 (Fed. Cir. 2018)................................................................4, 5, 15

*BuySafe, Inc. v. Google, Inc.,*
    765 F.3d 1350 (Fed. Cir. 2014)................................................................9

*CardioNet, LLC v. InfoBionic, Inc.,*
    955 F.3d 1358 (Fed. Cir. 2020)................................................................3

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
　　906 F. Supp. 2d 399 (W.D. Pa. 2012) ..................................................17

*Celgard, LLC v. Shenzhen Senior Tech. Material Co.*,
　　2020 WL 7392909 (W.D.N.C. Dec. 17, 2020) ....................................19

*ChargePoint, Inc. v. SemaConnect, Inc.*,
　　920 F.3d 759 (Fed. Cir. 2019) .................................................9, 11, 14

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
　　776 F.3d 1343 (Fed. Cir. 2014) ...........................................13, 14, 15

*CTD Networks, LLC v. Google, LLC*,
　　688 F. Supp. 3d 490 (W.D. Tex. 2023) ................................................20

*Customedia Techs., LLC v. Dish Network Corp.*,
　　951 F.3d 1359 (Fed. Cir. 2020) ..........................................................4

*e-Watch Inc. v. Avigilon Corp.*,
　　2013 WL 5231521 (S.D. Tex. Sept. 13, 2013) .....................................16

*Elec. Power Grp., LLC v. Alstom S.A.*,
　　830 F.3d 1350 (Fed. Cir. 2016) ................................................. *passim*

*Intell. Ventures I LLC v. Capital One Bank (USA)*,
　　792 F.3d 1363 (Fed. Cir. 2015) ..........................................................4

*Intell. Ventures I LLC v. Erie Indem. Co.*,
　　850 F.3d 1315 (Fed. Cir. 2017) .................................................13, 14

*Intell. Ventures I LLC v. Symantec Corp.*,
　　838 F.3d 1307 (Fed. Cir. 2016) ...................................................6, 15

*JVC Kenwood Corp. v. Nero, Inc.*,
　　797 F.3d 1039 (Fed. Cir. 2015) .........................................................19

*Lans v. Digital Equip. Corp.*,
　　252 F.3d 1320 (Fed. Cir. 2001) .........................................................16

*Lyda v. CBS Corp.*,
　　838 F.3d 1331 (Fed. Cir. 2016) .........................................................20

*Radar Indus., Inc. v. Cleveland Die & Mfg. Co.*,
　　424 F. App'x 931 (Fed. Cir. 2011) ....................................................19

*SAP Am., Inc. v. InvestPic, LLC*,
　　898 F.3d 1161 (Fed. Cir. 2018) ......................................................2, 9

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016)................................................................13

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)................................................................13

*Trinity Info Media, LLC v. Covalent, Inc.*,
    72 F.4th 1355 (Fed. Cir. 2023) ................................................................6

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)........................................5, 6, 9, 10

*VDPP, LLC v. Volkswagen Group of Am., Inc.*,
    2024 WL 3378456 (S.D. Tex. July 11, 2024)......................................17

*Versata Software, Inc. v. NetBrain Techs., Inc.*,
    2015 WL 5768938 (D. Del. Sept. 30, 2015)......................................14

*WirelessWerx IP LLC v. OnStar, LLC*,
    2024 WL 1607018 (E.D. Mich. Apr. 12, 2024)..................................19

*Yu v. Apple Inc.*,
    1 F.4th 1040 (Fed. Cir. 2021) ................................................................6

**Statutes**

35 U.S.C. § 101.................................................................................... *passim*

35 U.S.C. § 287....................................................................1, 16, 17, 18

**Other Authorities**

Fed. R. Civ. P. 8....................................................................................19

Fed. R. Civ. P. 11..................................................................................18

Fed. R. Civ. P. 12(b)(6).........................................................1, 2, 16, 20

All emphasis is added unless otherwise noted.

# I.    INTRODUCTION

Plaintiffs' Second Amended Complaint (Dkt. 64) ("Complaint") fails to state a claim under Rule 12(b)(6) and should be dismissed for three independent reasons.

*First*, several asserted pre-*Alice* patents claim only abstract concepts—dividing tasks among processors on a first-come/first-served basis, outsourcing cluster hosting and monitoring, or organizing and storing information—implemented with conventional computer and networking technology. They disclose no technological innovation and are invalid under 35 U.S.C. § 101 and *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014). Counts I, VI, IX, and XI should be dismissed.

*Second*, Plaintiffs seek presuit damages without plausibly pleading compliance with the marking statute, 35 U.S.C. § 287. Because marking compliance is a prerequisite to recovering presuit damages, any such claim must be dismissed.

*Third*, the Complaint does not identify any specific Southwest product or service that infringes. Instead, it broadly points to third-party tools like Docker, Kubernetes, Kafka, Spark, and Hadoop and asserts that any Southwest "system or service" using them infringes—even though the Complaint acknowledges that many providers of these tools, as well as upstream equipment suppliers for in-flight connectivity, are licensed under the asserted patents. By sweeping so broadly while disregarding those licenses, Plaintiffs fail to allege any unlicensed or unauthorized use. These vague, conclusory allegations do not give Southwest the fair notice required by *Bell Atl. v. Twombly*, 550 U.S. 544, 556 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009).

For these reasons, the Court should dismiss Plaintiffs' claims under Rule 12(b)(6).

# II.    ARGUMENTS

## A.  Invalidity Under 35 U.S.C § 101 and *Alice*

Under the two-step test in *Alice*, a patent claim is ineligible under § 101 if (1) it is "directed to" a patent-ineligible concept, such as an abstract idea, and (2) it lacks any "inventive concept"

sufficient to transform the abstract idea into a patent-eligible application. 573 U.S. at 217–18; *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166–67 (Fed. Cir. 2018). Although patent eligibility can turn on underlying facts, it remains a question of law and may be resolved on a Rule 12(b)(6) motion. *InvestPic*, 898 F.3d at 1166; *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).

The claims at issue here apply abstract ideas using generic computing hardware and software, without any new algorithm, configuration, or technological improvement. These claims recite broad, functional results implemented on standard systems—without providing specific, inventive technological solutions, such as improved hardware, data structures, algorithms, or other technical advancements. Dismissal is proper because the patents themselves admit the underlying technologies used to implement the abstract ideas—first-come/first-served scheduling of tasks, outsourced hosting of computer clusters, and root-leaf storage—were well-understood, routine, and conventional by the time of the purported inventions.

### 1.  U.S. Patent No. 7,257,582 on First-Come/First-Serve Processing

The '582 Patent in Count VI, titled *Method for Managing Distributed Processing of Tasks in a Network*, addresses dividing large input files into subtasks executed across distributed processors. The claimed method partitions an input file, distributes all partitions to each processor, executes subtasks in parallel, and repeats the processing on a "first-come/first-served" basis rather than using precomputed load-balancing. *See* '582 Patent at 1:6–20, 3:35–47.

Claim 1, charted as representative, recites in relevant part:

> 1.     A method of effecting on a preexisting input file a computer-executable process comprised of a plurality of subtasks, the method comprising the steps of:
>
> (a) automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions;
>
> (b) distributing descriptions of all of said partitions to … processors;
>
> (c) **simultaneously executing … subtasks** in each of at least some of said processors on a respective partition …;

(d) thereafter **repeating step (c)** in at least some of the subtask processors each with another unprocessed partition ***on a first-come/first-served basis***; and

(e) generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks.

The specification concedes that most steps were conventional in distributed computing. Partitioning relied on known techniques such as byte ranges or track addresses; distributing used standard control files; processors performed routine read-process-write operations; and aggregation was a familiar merging step. *See* '582 Patent at 3:35–47, 3:67–4:15, 4:59–63.

During prosecution, the applicant admitted that the only purported advance was step (d)—the use of first-come/first-served scheduling. *See* Ex. C, Mar. 2, 2007 Remarks. The patentee analogized the invention to a four-way stop: unlike prior art "traffic lights" that precompute when each driver may proceed, the claimed system allows processors to take tasks as they become available. The patentee described this feature as the "primary difference" over the art.

That admission highlights the patent's ineligibility under § 101. First, it defines the "focus of the claimed advance over the prior art," which is the touchstone for *Alice* step one. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257–58 (Fed. Cir. 2016). Second, by comparing the invention to a traffic pattern, the patentee confirmed that the claims merely implement a conventional human method of queue management on a computer.

The claims do not recite any technological improvement to processors, memory, or distributed systems. Instead, they describe desired results—partitioning, distributing, processing, scheduling, and aggregating—in purely functional terms. The '582 Patent therefore claims nothing more than an abstract scheduling concept executed on generic hardware.

**a.  Claim 1 Is Directed to an Abstract Queue Management Technique.**

At *Alice* step 1, courts examine the claims in view of their language, the specification, and, if relevant, the prosecution history. *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372, 1374

(Fed. Cir. 2020). The focus is on the "claimed advance over the prior art." *Affinity Labs*, 838 F.3d at 1257. To be patent eligible, the claims must improve "the functionality of the computer or network platform itself." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364 (Fed. Cir. 2020). Simply invoking a computer as a tool to implement an abstract idea is not sufficient. *See BSG Tech. L.L.C. v. Buyseasons, Inc.*, 899 F.3d 1281, 1287–88 (Fed. Cir. 2018).

Claim 1 of the '582 Patent is directed to the abstract idea of dividing a large task into subtasks and assigning them for processing on a first-come/first-served basis. This is a fundamental organizational principle: break a job into smaller tasks, assign them to workers, and have workers request new tasks when finished. Human beings have managed work in this manner for centuries. Claims rooted in such organizational practices are abstract. *See Intell. Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015).

The Federal Circuit has explained that there is a "critical difference between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to the problem in general." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016). Claim 1 falls into the latter category. It does not improve computer technology or solve a specific technical problem; it merely applies a commonsense workload-management practice to distributed computing. The specification itself acknowledges that partitioning data, distributing tasks, executing in parallel, and aggregating results were all well-known operations. *See* '582 Patent at 3:35–4:15, 4:59–63.

The supposed "advance"—first-come/first-served scheduling—only underscores the abstractness. In prosecution, the applicant described the invention as akin to traffic at a four-way stop, contrasting it with a traffic light. That analogy confirms that the invention is nothing more than a human method of queue management, applied to computers. The claim recites this concept

at a high level of generality, using functional language such as "logically subdividing," "distributing," and "aggregating," without describing how those steps are to be implemented. This is precisely the type of results-oriented drafting the Federal Circuit has found abstract. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337–38 (Fed. Cir. 2017).

Claim 1 does not recite any unconventional techniques for partitioning data, distributing subtasks, or aggregating results. *See* '582 Patent at 3:35–4:15, 4:59–63. It claims only the outcome of applying a familiar queue-management concept to computers. As *Elec. Power* makes clear, claims directed to results of data processing without concrete means for achieving them are abstract and invalid. Because Claim 1 is directed to nothing more than a longstanding method of organizing tasks, it is ineligible under *Alice* step one.

### b. Claim 1 Lacks an Inventive Concept.

To transform an abstract idea into patent-eligible subject matter, a claim must include an "inventive concept"—something "significantly more" than the abstract idea itself. *Alice*, 573 U.S. at 217–18. Well-understood, routine, and conventional techniques do not qualify. *BSG Tech.*, 899 F.3d at 1290–91. Nor does computer implementation of an abstract idea supply an inventive concept if "carried out in existing computers long in use." *Alice*, 573 U.S. at 222.

Claim 1 of the '582 Patent recites only conventional steps and generic components without introducing any meaningful technical improvements. The elements—partitioning input data, distributing tasks to processors, executing subtasks in parallel, and aggregating results—were all well-known techniques for workload distribution, as the specification itself concedes. *See* '582 Patent at 3:35–4:15, 4:59–63.

The supposed point of novelty—first-come/first-served scheduling—is likewise routine. As the applicant admitted, it is no different from managing cars at a four-way stop. Far from a technical innovation, it merely applies a basic human queue-management principle to computer

processing. Such claims "merely appl[y] well-known ideas using generic computers." *Intell.*
*Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 (Fed. Cir. 2016). The specification does
not identify any unique adaptation of this scheduling technique to distributed computing. It simply
applies this known concept predictably to allocate unprocessed subtasks. Thus, claim 1 is "directed
to a result or effect that itself is the abstract idea and merely invoke[s] generic processes and
machinery" rather than "a specific means or method that improves the relevant technology." *Yu v.*
*Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021).

Confirming the lack of inventiveness, the patent relies entirely on generic computing
components such as processors, memory, and network architecture. *See* '582 Patent at 4:27–36.
The Federal Circuit has made clear that reciting these components without "novel configurations
or functionalities" does not add an inventive concept. *Trinity Info Media, LLC v. Covalent, Inc.*,
72 F.4th 1355, 1364, 1366–67 (Fed. Cir. 2023). The claim's functional language—"automatically
determining," "logically subdividing," "distributing," "executing," and "combining"—describes
desired results at a high level of abstraction, without concrete mechanisms. This is the type of
result-oriented claiming the Federal Circuit has repeatedly rejected. *See Two-Way Media Ltd. v.*
*Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337–38 (Fed. Cir. 2017); *Elec. Power Grp., LLC*
*v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016).

Because Claim 1 offers nothing beyond an abstract scheduling idea implemented on
conventional computer components, it fails to supply an inventive concept under Alice step 2.
Count VI should therefore be dismissed.

### 2.  U.S. Patent No. 8,352,584 on Outsourced Computer Clusters

The '584 Patent, titled *System for Hosting Customized Computing Clusters*, claims a system
for hosting computing clusters for use by clients. The purported problem is a logistical challenge,
not a technological one: while "multiple cluster systems" were already known and conventional,

they were "typically limited" because "clients are required to host and manage the clusters that are located on their site or in their facilities." '584 Patent at 4:60–5:2, 5:19–21.[1]

As its proposed solution, the patent describes outsourcing cluster management by providing a "hosted cluster system" located remotely from the client. *Id.* at 5:22–25. Clients can "access their hosted cluster from a remote location via … the Internet or other network," allowing them to offload the burden of on-site infrastructure. *Id.* at 4:25–27. The patent frames the invention as solving common problems associated with managing computer clusters by hosting computer clusters for clients using "a network for communications with a corresponding client and monitoring equipment and/or software modules." *Id.* at 4:53–58. It characterizes the system as one that provides clients with the "computational assets or power" they need "while not presenting an unacceptable burden on the clients' resources." *Id.* at 2:52–56.

The "present invention" is described as "hosting a plurality of clusters that are each configured for a particular task … and optionally providing for configuration, access control, and monitoring." *Id.* at 2:64–3:3. But the only distinction claimed over conventional clusters is location: the "cluster systems of the invention … are physically provided at one or more locations that are remote from the processing user or client's facilities." *Id.* at 4:19–23.

Claim 1, the only claim referenced or charted in the Complaint, recites a generic system architecture implementing this outsourcing model:

> 1.     A computer system, comprising:
> a private communications network linked to a public communications network;
> a first cluster … in a first configuration … linked to the private communications network;

---

[1] The '584 Patent (Count IX) shares a specification with the '841 Patent (Count VIII). However, IV chose to assert the '841 Patent in a separate lawsuit, Case No. 7:25-cv-00252-ADA. Southwest has already filed a motion to dismiss on § 101 grounds in that other case. *See id.* at Dkt. 9.

> a second cluster … in a second configuration … linked to the private communications network;
>
> a monitoring system …;

with additional limitations requiring communications isolation, defining clusters as "high performance," and linking each cluster through respective gateways.

The terms in claim 1 are defined broadly and generically. The specification makes clear that the invention extends to "any particular type of cluster or to particular hardware and/or software components." *Id.* at 10:22–25. The term "configuration" encompasses virtually every conventional aspect of cluster design, including "the physical components," "the topology of the cluster," and "any clustering software utilized to manage the cluster." *Id.* at 10:50–58.

Similarly, the "monitoring system" is described as relying on off-the-shelf tools such as the Intelligent Platform Management Interface (IPMI) and Simple Network Management Protocol (SNMP). *Id.* at 7:53–62. The patent does not disclose or claim any improvement to the clusters themselves, the computing resources, the network, or the monitoring systems; it merely assembles known components in a conventional arrangement.

### a.   Claim 1 Is Directed to a Business Idea.

Claim 1 of the '584 Patent is directed to the abstract idea of offloading computing tasks to remote clusters and monitoring them—a logistical or business goal, not a technological improvement. The supposed advance of hosting clusters remotely is framed in the patent as a solution to reduce clients' infrastructure costs, not a technical enhancement. '584 Patent at 1:39–43. Claim 1 recites only a system that can receive a client task over a public network and execute it using remote clusters linked by conventional networking components.

The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server" is an abstract idea. *Bridge and Post, Inc. v. Verizon*

*Commc'ns, Inc.*, 778 F. App'x 882, 892 (Fed. Cir. 2019) (quoting *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766–67 (Fed. Cir. 2019)); *see also BuySafe, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends information over a network … is not even arguably inventive."). Just like in *ChargePoint*, where adding network communications to known systems did not render the claims eligible, claim 1's functional recitation of "performing a client task," "monitoring operations," and "reporting the state of the cluster" merely describes abstract outcomes without concrete technological solutions.

Similarly, in *Two-Way Media*, the Federal Circuit held claims invalid where they recited functional results—"converting," "routing," and "monitoring"—without any technological implementation, because the claims simply relied on a generic network architecture performing routine tasks. 874 F.3d at 1337–38. The '584 Patent's claim 1 is no different: it describes using standard hardware to execute client tasks over a network without any improvement to the functionality of the clusters or networks themselves.

The generic monitoring elements of the claim likewise fail to impart eligibility. Claim 1's monitoring system simply checks for problems and reports them using conventional tools like SNMP and IPMI—off-the-shelf technologies that the patent admits are standard. '584 Patent at 7:53–62. This is akin to *InvestPic*, where the Federal Circuit found that claims focused on collecting, analyzing, and reporting information using standard computers were abstract and lacked any technological improvement. 898 F.3d at 1167–68. Because claim 1 does not improve how computers or networks function, but instead recites a generic use of existing systems to carry out an abstract hosting and monitoring scheme, it fails *Alice* step 1.

### b. Claim 1 Lacks an Inventive Concept.

Claim 1 of the '584 Patent also fails *Alice* step 2 because it uses only generic computer components to perform conventional functions. The specification confirms that all components of

claim 1 are standard. The system includes a "public communications network,"[2] a "private communications network," two computing clusters, and a monitoring system. But none of these elements are novel or unconventional. The "clusters" are conventional computing clusters made up of processing nodes, shared storage, and standard networking.

The monitoring system fares no better. It consists of two main components implemented using existing, off-the-shelf technologies: the IPMI and SNMP—both longstanding, conventional tools for monitoring system health. '584 Patent at 7:53–62. Their inclusion confirms the absence of any technological advance. The use of such "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility. *Elec. Power Grp.*, 830 F.3d at 1355; *see also Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."). Claim 1 fails *Alice* step 2 because it merely uses standard clusters and networks to perform ordinary hosting and monitoring tasks.

The '584 Patent does not identify any non-conventional arrangement of these elements. It claims a routine setup in which two generic clusters are linked to an intranet, receive tasks from a public network, and use standard monitoring tools. That configuration reflects a typical managed data center architecture—not an inventive concept.

In addition, claim 1 does not recite any inventive combination of elements. Although an inventive concept can sometimes arise from a "non-conventional and non-generic arrangement of known, conventional pieces," *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d

---

[2] The "public communications network" is generally understood by the specification to mean the Internet. *E.g.*, '584 Patent at 3:8–10, 4:23–27. In contrast, the "private communications network" is a typical intranet using established protocols such as "Gigabit Ethernet," "10 Gigabit Ethernet," "Infiniband™," or "Myrinet™." '584 Patent at 7:41–52.

1341, 1350 (Fed. Cir. 2016), the ordered combination here is conventional: computing clusters communicating over standard networks, monitored using known tools. This mirrors the type of generic implementation the Federal Circuit repeatedly finds ineligible.

As in *Elec. Power*, the claims "do not require any non-conventional and non-generic arrangement of known, conventional pieces," and merely perform generic functions on standard computer components. 830 F.3d at 1355. *ChargePoint* confirms the same principle: adding generic networking to existing systems does not impart inventiveness. 920 F.3d at 774–75. Claim 1 does not improve how clusters, networks, or monitoring systems function; it simply applies conventional tools in their ordinary roles to achieve abstract results without any "improvement to the functioning of the computer itself." *Alice*, 573 U.S. at 225.

Because claim 1 lacks any inventive concept, it fails both steps of the Alice inquiry and is not directed to patent-eligible subject matter. Count IX should therefore be dismissed.

### 3.  U.S. Patent Nos. 8,332,844 and 7,721,282 on Root-Leaf Storage

The '844 and '282 Patents in Counts I and XI share a common specification lineage and focus on the concept of distributed application environments. The '282 Patent, titled *Block-Level I/O Subsystem for Distributed Computing Environment Management*, was filed first and describes a system in which read-only "root images" are merged with per-node "leaf images" using a "union block device" to deploy computing environments across multiple nodes. The '844 Patent, titled *Root Image Caching and Indexing for Block-Level Distributed Application Management*, is a continuation-in-part of the '282 Patent and extends the shared specification by introducing caching and indexing mechanisms to optimize the deployment of distributed environments.

Both patents depend on underlying techniques that were admittedly well-understood, routine, and conventional practices at the time of filing. For example, clustered computing and distributed file systems were established technologies. *See* '282 Patent at 1:21–35; '844 Patent at 1:31–45.

11

Root-leaf storage methods were commonly used to create boot images "on the fly." *See* '282 Patent at 1:62–2:6; '844 Patent at 2:14–25. And caching mechanisms, including least-recently-used (LRU) algorithms, were known in the art. *See* '844 Patent at 6:38–7:17.

The '282 Patent claims a system for organizing and storing information, with claim 1 charted as representative for Count XI (Dkt. 64-24). Claim 1 recites, in relevant part:

> 1. A system for distributing an application environment comprising:
>
> a compute node comprising a computer system;
>
> a first storage unit for storing blocks of **a root image** …;
>
> a second storage unit for storing **a leaf image** …; and
>
> a union block device for interfacing between the compute node and the first and second storage units … wherein **the union block device creates the application environment by merging** the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit ….

The '844 Patent claims methods for organizing and storing information, with claim 7 charted as representative for Count I (Dkt. 64-8). Claim 7 recites, in relevant part:

> 7. A method for providing data to a plurality of compute nodes, comprising:
>
> storing blocks of **a root image** of said compute nodes on a first storage unit;
>
> storing **leaf images** for respective compute nodes on respective second storage units…; and
>
> **caching blocks of said root image** that have been accessed by at least one of said compute nodes in a cache memory.

Both patents rely on generic computer hardware and software implementations, as shown in Figure 1 of each patent, which depict general-purpose computing devices with standard storage media. *See* '282 Patent at 4:11–40; '844 Patent at 4:27–56. Components such as "Union Block Devices" (UBDs) are described merely as low-level drivers without any disclosed novel functionality. *See* '282 Patent at 4:41–45; '844 Patent at 5:19–64. The claims are drafted in broad functional language—"providing," "distributing," "storing," "interfacing," and "caching"— without specifying any improved algorithms, hardware, or software. In sum, the claims reflect the

conventional practice of storing one type of data (a "root image") in a first location, storing another type of data (a "leaf image") in a second location, and utilizing standard hardware and routine techniques to merge or cache the data.

The prosecution history of the '282 Patent underscores the abstract nature of the claims. On July 8, 2009, the examiner rejected original claims 1–33 under § 101, explaining the system was "an abstract idea" that failed to disclose how it would "process and carry out its intended results." *See* Ex. A at 4–5. The applicant overcame the rejection by amending the claims to recite generic hardware components, such as the "first storage unit," "second storage unit," and "union block device." *See* Ex. B at 1. While the amendments satisfied the examiner's objection at the time, modern § 101 precedent makes clear that merely adding conventional hardware does not transform an abstract idea into a patent-eligible invention. *See, e.g., Alice*, 573 U.S. at 223–24.

### a.  Claims 1 and 7 Are Directed to Organizing and Storing Information.

Claim 1 of the '282 Patent and claim 7 of the '844 Patent both recite the abstract concept of organizing and storing information in a root-leaf structure: keeping a master "root image" shared across compute nodes, maintaining individualized "leaf images" for per-node changes, and (for the '844 Patent) caching frequently accessed blocks. These steps mirror basic data collection and organization practices analogous to longstanding human conduct—*e.g.*, keeping a central record and local edits—without any technical innovation. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1146 (Fed. Cir. 2016) (organizing information is an abstract idea); *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017) (same); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) ("*TLI*") (claim related to creating and storing data images based on "classification" of the data); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of data collection, recognition, and storage is undisputedly well-known.").

Claim 1 recites broad steps—storing root and leaf images and merging them using a generic "union block device"—without any specific algorithm, circuit, or new file-system structure. *See* '282 Patent at claim 1; *see also ChargePoint*, 920 F.3d 769 (claims using functional language to describe results without specific technological means are abstract). The patent itself concedes these concepts were conventional: cluster computing and distributed file systems were established technologies; root-leaf boot images were common; and caching algorithms like LRU were routine. *See* '282 Patent at 1:21–35, 1:62–2:6; '844 Patent at 1:31–45, 2:14–25, 6:38–7:17.

Claim 7 of the '844 Patent merely adds caching blocks already accessed—another routine function the specification admits was standard. *See* '844 Patent at 6:38–7:17; *Erie Indem.*, 850 F.3d at 1327 ("organizing and accessing data includes longstanding conduct that existed well before the advent of computers"). Simply storing data in a hierarchy, caching it, or recognizing and organizing information are classic examples of abstract ideas. *See Content Extraction*, 776 F.3d at 1347; *Versata Software, Inc. v. NetBrain Techs., Inc.*, 2015 WL 5768938, at *7 (D. Del. Sept. 30, 2015) ("representing information in a hierarchy amounts to an abstract idea").

In the end, the claims resemble a traditional library system: the central card catalog serves as a shared, primary record (root); individual checkout cards track each book's borrower and status (leaf); and the return cart holds recently returned books awaiting reshelving (cache)—highlighting that these practices are longstanding techniques for organizing and storing information, not inventive technological solutions. Because the claims do not specify any concrete mechanism or technical advancement beyond these conventional organizational methods, they are directed to an abstract idea and fail *Alice* step 1.

### b.  Claims 1 and 7 Lack an Inventive Concept.

Claims 1 and 7 also fail *Alice* step 2 because they do not recite any "inventive concept" that could transform the abstract idea of organizing and storing information into a patent-eligible

application. *See Alice*, 573 U.S. at 217–18. Instead, the claims apply the abstract root-leaf storage idea using generic, conventional computing components.

The patents themselves concede that the claimed techniques—storing root images, maintaining leaf images for local changes, and caching frequently accessed blocks—were all well-known, conventional practices at the time of filing. *See* '282 Patent at 1:21–35, 1:62–2:6 (cluster computing, distributed file systems, root-leaf boot images); '844 Patent at 1:31–45, 2:14–25, 6:38–7:17 (caching). These admissions confirm that the claims use generic computing hardware and software without any new algorithms, configurations, or technological improvements. *Symantec*, 838 F.3d at 1315 ("claims use generic computers to perform generic computer functions").

The claims themselves underscore their conventional nature, reciting only high-level functional steps—"providing," "distributing," "storing," "interfacing," and "caching"—without specifying any inventive implementation for these tasks. *See BSG Tech.*, 899 F.3d at 1290–91 ("If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea"). Components like the "union block device" are described in the specification as low-level drivers performing routine merging of data blocks, not any technological advance. *See* '282 Patent at 4:41–45; '844 Patent at 5:19–64.

Courts have invalidated similar claims applying conventional computing elements to abstract goals. *See, e.g.*, *Content Extraction*, 776 F.3d at 1348 (holding claims for data extraction and storage invalid because they relied on routine computing hardware and techniques). Claims 1 and 7 fall squarely in this category, merely combining conventional elements to perform abstract data organization and caching without any innovative improvement.

The prosecution history of the '282 Patent reinforces the absence of a non-abstract inventive concept. The examiner initially rejected the claims as abstract, and the applicant overcame that rejection solely by adding generic hardware references, such as "first storage unit," "second storage unit," and "union block device." *See* Ex. A at 4–5; Ex. B at 1. But under modern § 101 precedent, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223–24.

In the end, the claims merely require storing one type of data (a "root image") in one place, another type of data (a "leaf image") in a second place, and using standard hardware and known techniques to merge or cache them. They provide no inventive concept. Because claims 1 and 7 fail both steps of the *Alice* inquiry, Counts I and XI should be dismissed.

### B.  Presuit Damages Are Not Available

To recover damages for alleged infringement occurring before the filing of a complaint, a patentee must comply with the patent marking statute, 35 U.S.C. § 287(a). "The patentee bears the burden of pleading and proving he complied with § 287." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017) ("*Arctic Cat I*"). This burden extends to licensees—a patentee must plead that it "made reasonable efforts to ensure compliance with the marking requirements by its licensees." *Id.* When a patentee does not sufficiently plead compliance, courts may dismiss claims for pre-suit damages under Rule 12(b)(6). *See, e.g., Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1328–29 (Fed. Cir. 2001); *e-Watch Inc. v. Avigilon Corp.*, 2013 WL 5231521, at *3 (S.D. Tex. Sept. 13, 2013).

The procedural history underscores the deficiency. IV first notified Southwest of alleged infringement of the '844, '722, '785, '326, '469, and '582 Patents on November 1, 2024, with the filing of the original complaint and accompanying notice letter. Dkts. 1, 1-7. It did not provide notice of the '080, '841, '584, '000, and '282 Patents until May 23, 2025, when it moved for leave

to file its amended complaint. Dkt. 37. In its original and first amended complaints, IV did not attempt to plead compliance with § 287 at all. Only after Southwest moved to dismiss did IV add marking allegations in its Second Amended Complaint. Dkt. 64 ¶¶ 224–227.

Those new allegations are both evasive and insufficient. In its Second Amended Complaint, IV still does not allege that (i) the asserted patents were continuously marked throughout the relevant period, including by prior owners; (ii) settling defendants and other licensees were required to mark products practicing the asserted claims; or (iii) IV undertook any effort to ensure marking compliance.[3] Instead, IV asserts only that it sells no products of its own, that some patents may contain only method claims, and that certain litigation licensees denied infringement. None of these points is controlling or sufficient to satisfy IV's statutory burden.

IV's own infringement theories underscore the defect. It charts the asserted patents against open-source software—such as Kubernetes, Spark, and Hadoop—systems supplied to Southwest by IV's own licensees, AWS and IBM/OpenShift, without patent markings. *See, e.g.*, Dkt. 64-8. By IV's own theory, those licensees are distributing practicing products without patent markings.

The same is true of the two aircraft Wi-Fi patents. IV accuses Southwest's systems supplied by Anuvu and Viasat, incorporating components from settling litigation defendants—Extreme

---

[3] IV does not allege facts showing full compliance with the marking statute by prior patentees and licensees. *See Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 950 F.3d 860, 864 (Fed. Cir. 2020) ("*Arctic Cat II*") (holding that "the cessation of sales of unmarked products" does not excuse "noncompliance with the notice requirement of § 287"). IV has sued and "settled" with defendants that "continued to sell the patented products," yet IV offers no facts showing "that these entities marked the accused products…. The law is clear … that licensees as well as patent holders must comply with the marking requirements." *See VDPP, LLC v. Volkswagen Group of Am., Inc.*, 2024 WL 3378456, at *1 (S.D. Tex. July 11, 2024). Indeed, IV concedes that it has licensees and that it does "not contractually require its licensees to mark." *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 906 F. Supp. 2d 399, 411 (W.D. Pa. 2012).

Networks and Aruba/HPE. IV makes no allegation that those components were marked or that IV took any steps to ensure compliance, despite accusing those systems of infringement.

The newly added allegations in the Second Amended Complaint serve only to cloud and obscure the marking issue rather than clarify and resolve it. IV has not pleaded—nor could it consistently with Rule 11—that it, its predecessors, and its licensees fully complied with § 287 throughout the relevant period. Having failed to plausibly allege compliance, IV cannot sustain its claim for pre-suit damages, and that portion of its pleading should be dismissed.

## C. No Infringing Uses Are Alleged

A complaint must "place the alleged infringer 'on notice of what activity … is being accused of infringement.'" *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021). "There must be some allegation of specific services or products of the [accused infringer] which are being accused." *Addiction & Detox. Inst. L.L.C. v. Carpenter*, 620 F. App'x 934, 937 (Fed. Cir. 2015).

Here, the Complaint alleges that Southwest infringes by offering unspecified "services and technologies" that use the third-party software programs Kubernetes, Kafka, Docker, Spark, and Hadoop. *See, e.g.*, Dkt. 64 ¶ 25. It asserts that these programs practice the '844, '722, '785, '584, '080, '282, and '582 Patents (Counts I–III, VI–VII, IX, and XI) but never identifies any specific Southwest product, system, or service accused of infringement. Instead, it defines "Accused Products and Services" broadly as any "products, services, and technologies" Southwest "makes, utilizes, services, tests, distributes, sells, offers, and/or offers for sale in the State of Texas and the Western District of Texas." Dkt. 64 ¶ 7.

The Complaint then compounds this ambiguity by accusing not only unspecified systems but also "all past, current, and future systems and services" that "operate in the same or substantially similar manner" or "have the same or substantially similar features." *See, e.g.*, Dkt. 64-8 at 2. It

further states these are only nonlimiting examples. *E.g.*, Dkt. 64 ¶ 49. Such sweeping allegations fail to give Southwest notice of what conduct is actually accused.

Like the deficient pleadings in *Carpenter* and *WirelessWerx IP LLC v. OnStar, LLC*, 2024 WL 1607018, at *9–10 (E.D. Mich. Apr. 12, 2024), the Complaint includes "bare allegations" that Southwest infringes merely because it uses common third-party software, without identifying any Southwest-specific implementation or feature alleged to infringe. This is exactly the sort of speculative pleading insufficient under Rule 8. *See Carpenter*, 620 F. App'x at 937; *Artrip v. Ball Corp.*, 735 F. App'x 708, 714–15 (Fed. Cir. 2018) (finding conclusory allegations insufficient where complaint could encompass virtually all aspects of defendant's operations).

Moreover, the Complaint's allegations of infringement are rendered implausible by its own admissions that upstream suppliers of the accused software or cloud services are licensed under the asserted patents—yet the Complaint fails to specify which providers are licensed and which are not. *E.g.*, Dkt. 64-8 at 2 n.1. This acknowledgment makes Plaintiffs' infringement theory speculative at best because it relies on the assumption that Southwest's use somehow falls outside of licensed activity without any supporting factual allegations. "The inclusion of [the phrase 'on information and belief'] creates an inference that [Plaintiffs] likely lack[] knowledge of the underlying facts to support the assertion[s], and [are] instead engaging in speculation to an undue degree." *Celgard, LLC v. Shenzhen Senior Tech. Material Co.*, 2020 WL 7392909, at *5 (W.D.N.C. Dec. 17, 2020). Because Plaintiffs admit that third-party providers of the accused technologies may be licensed, Plaintiffs' failure to identify which uses are unlicensed underscores the implausibility of their infringement claims. *See Radar Indus., Inc. v. Cleveland Die & Mfg. Co.*, 424 F. App'x 931, 933 (Fed. Cir. 2011) ("An express or implied license is a defense to infringement."); *JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1045 (Fed. Cir. 2015) ("without

specific allegations and evidence showing use of unlicensed optical discs, Nero has established a complete defense to all of JVC's allegations of infringement under the Patents.").[4] Plaintiffs' statement that they "will provide relevant license agreements . . . in discovery" underscores that they cannot meet their burden to plausibly plead infringement before proceeding to litigation. *See Twombly*, 550 U.S. at 556, 558 ("[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.").[5]

### III.    CONCLUSION

For the foregoing reasons, each of Plaintiffs' claims in the First Amended Complaint is legally deficient. Several asserted patents recite abstract ideas implemented with conventional computer and networking technology. In addition, all claims fail to plead compliance with the marking statute necessary to recover pre-suit damages, and do not plausibly identify any specific infringing Southwest product or service. Accordingly, Defendant respectfully requests that the Court dismiss Plaintiffs' First Amended Complaint in its entirety under Rule 12(b)(6).

---

[4] Because the Complaint's enhanced damages allegations rest entirely on these implausible direct infringement claims, dismissal of the direct infringement allegations necessarily requires dismissal of Plaintiffs' claims for enhanced damages as well. *See CTD Networks, LLC v. Google, LLC,* 688 F. Supp. 3d 490, 503 (W.D. Tex. 2023).

[5] To the extent Plaintiffs attempt to allege joint infringement, *see, e.g.,* Dkt. 64 ¶ 49, the Complaint does not identify any third parties allegedly performing steps of the claimed methods or allege facts showing Southwest directed or controlled any such parties, as required to state a plausible joint infringement claim. *See Lyda v. CBS Corp.,* 838 F.3d 1331, 1338–39 (Fed. Cir. 2016).

Dated: September 16, 2025

Respectfully submitted,

*/s/ S. Wallace Dunwoody*
Michael C. Wilson
Texas Bar No. 21704590
mwilson@munckwilson.com
S. Wallace Dunwoody
Texas Bar No. 24040838
wdunwoody@munckwilson.com
**Munck Wilson Mandala, LLP**
2000 McKinney Avenue, Suite 1900
Dallas, Texas 75201
(972) 628-3600
(972) 628-3616 fax

David G. Henry
Texas Bar. No. 09479355
dhenry@munckwilson.com
**Munck Wilson Mandala, LLP**
510 Austin Avenue, Suite 3100
Waco, Texas 76701
(254) 362-2300
(254) 362-2304 fax

Tri T. Truong
Texas Bar No. 24102969
ttruong@munckwilson.com
**Munck Wilson Mandala, LLP**
807 Las Cimas Parkway, Suite 300
Austin, Texas 78756
737-201-1600
737-201-1601 fax

*Attorneys for Southwest Airlines Co.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was filed and served to all counsel of record using the Court's CMECF system on September 16, 2025.

*/s/ S. Wallace Dunwoody*
S. Wallace Dunwoody