**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **INTELLECTUAL VENTURES I, LLC and INTELLECTUAL VENTURES II LLC,** | § § § | |
| *Plaintiffs,* | § § | **Civil Action No. 7:24-cv-00277-ADA** |
| **v.** | § § | **JURY TRIAL DEMANDED** |
| **SOUTHWEST AIRLINES CO.,** | § § | |
| *Defendant.* | § § | |

---

**DEFENDANT SOUTHWEST AIRLINES CO.'S
OPENING CLAIM CONSTRUCTION BRIEF FOR U.S. PATENT NOS.
7,721,282, 8,332,844, 7,949,785, AND 8,407,722**

---

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................... 1

II.   LEGAL STANDARDS .............................................................................................. 1

   A.  Lexicography Standards ................................................................................ 2

   B.  Prosecution Disclaimer Standards ................................................................ 2

III.  PERSON OF ORDINARY SKILL IN THE ART .................................................... 3

IV.  DISPUTED CONSTRUCTIONS ............................................................................. 3

   A.  U.S. Patent Nos. 7,721,282 and 8,332,844 .................................................. 3

      1.  "root image" ('844 Patent at claim 7; '282 Patent at claims 1 and 15) ................... 5

      2.  "leaf images" ('844 Patent at claim 7; '282 Patent at claims 1 and 15) ................... 7

      3.  "merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments" ('844 Patent at claim 11; '282 Patent at claim 15) ............................................ 9

      4.  "union block device" ('282 Patent at claims 1 and 15) ......................................... 11

   A.  U.S. Patent No. 7,949,785 ......................................................................... 12

      1.  "network address" (claim 30) .................................................................... 13

      2.  "distribute a virtual network address to the device" (claim 30) ............................. 14

      3.  "network route director" (claim 30) ............................................................ 15

   B.  U.S. Patent No. 8,407,722 ......................................................................... 17

      1.  "respond to the live object of the data representation by determining an object identifier (ID) of the live object" (claim 14) ................................ 17

      2.  "register for updates of the live object with the routing network" (claim 14) ....... 19

      3.  "input source" / "identify a category of the update message based on the input source" (claim 14) ....................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AstraZeneca LP v. Apotex, Inc.*,
    633 F.3d 1042 (Fed. Cir. 2010)....................................................................................2, 7

*Aylus Networks, Inc. v. Apple Inc.*,
    856 F.3d 1353 (Fed. Cir. 2017)..........................................................................................2

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001)..........................................................................................2

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008)..........................................................................................3

*MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007).......................................................................................2, 3

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)..........................................................................................2

*Omega Eng'g, Inc, v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)..........................................................................................2

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)...................................................................1, 2, 3

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006)..........................................................................................3

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995)............................................................................................2

## I.    INTRODUCTION

Intellectual Ventures ("IV") has built a licensing campaign around patents that span unrelated technologies—data storage, cloud computing, and wireless communications—and target industries with little in common beyond their reliance on common open-source software and networking solutions. Because many industries use the same software tools, IV has asserted untested patents against companies as varied as airlines, retailers, insurers, and banks, sometimes based on little more than a LinkedIn reference to experience with specific open-source technologies. Grouping such disparate patents in a single action magnifies the complexity of the case and makes careful claim construction difficult but essential.

IV contends that *none* of the terms in any of the Asserted Patents requires construction, advocating instead for "plain meaning" interpretations that would allow its experts to argue claim scope in reports and at trial. That approach should not be permitted where the specifications and prosecution histories include definitional language and disclaimers that limit the meanings of key terms. Because claim construction is a question of law for the Court—not a factual dispute for experts—the Court should resolve the parties' disputes now rather than allow competing claim interpretations to reach the jury.

## II.    LEGAL STANDARDS

The purpose of claim construction is to give claim terms the meaning understood by a person of ordinary skill in the art at the time of invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-14 (Fed. Cir. 2005) (en banc). The plain meaning of claim language ordinarily controls *unless* the patentee acts as his own lexicographer and provides a special definition for a particular claim term or the patentee disavows the ordinary scope of a claim term either in the specification or during prosecution. *Phillips*, 415 F.3d at 1313. Even if a patent uses a term's plain meaning, the Court must resolve any genuine dispute regarding the scope of that meaning, to prevent the parties and

their experts from presenting competing claim construction arguments to the jury. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360–62 (Fed. Cir. 2008).

### A. Lexicography Standards

"[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1051–52 (Fed. Cir. 2010) (quoting *Phillips*, 415 F.3d at 1316). The specification need not reveal such a definition explicitly. *Id.* (citing *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001)). "[W]hen a patentee uses a claim term throughout the entire patent specification in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Id.* (quoting *Bell Atlantic*, 262 F.3d at 1271).

### B. Prosecution Disclaimer Standards

"Prosecution disclaimer 'preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.'" *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) (quoting *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003)). "[T]he doctrine of prosecution disclaimer ensures that claims are not 'construed one way in order to obtain their allowance and in a different way against accused infringers.'" *Id.* at 1360 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)). Disclaimer may occur through amendment or argument. *Id.* at 1359.

Statements disclaiming scope must be clear and unmistakable. *Omega*, 334 F.3d at 1326. Disclaimer statements include arguments made to convince the Patent Office of patentability, including when the patentee "draw[s] distinctions between the patented invention and the prior art." *MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007). Such arguments show "the patentee intended to surrender territory, since they indicate in the inventor's

2

own words what the invention is not." *Id.*; *see also Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008); *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).

## III. PERSON OF ORDINARY SKILL IN THE ART

A court determines the proper construction of a claim term from the viewpoint of the hypothetical person of ordinary skill in the art ("POSITA"). *Phillips*, 415 F.3d at 1313. The Asserted Patents relate to computational devices and networking. A person of ordinary skill in the art as of the respective priority dates for the Asserted Patents would have had a bachelor's degree in electrical engineering, computer science, or the like, and/or two or more years of industry experience in networking and distributed computing. Additional experience may make up for a lack of education and *vice versa*.

## IV. DISPUTED CONSTRUCTIONS

### A.   U.S. Patent Nos. 7,721,282 and 8,332,844

The '282 Patent (Ex. A-1) and the '844 Patent (Ex. A-2) share a common specification lineage and focus organizing and storing information in distributed application environments.

The '282 Patent—titled *Block-Level I/O Subsystem for Distributed Computing Environment Management*—describes a system "for distributing an application environment to a compute node (e.g., a server or a thin client workstation)" that includes (i) "a first storage unit for storing [data] blocks of a root image (e.g., an operating system) of the compute node," (ii) "a second storage unit for storing a leaf image comprising new data blocks and changes to the blocks of the root image," and (iii) "a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node." '282 Patent at 2:16–27 (*see also* Fig. 3 flow). "The union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the leaf image stored on the second

3

storage unit." *Id.* at 2:27–30. The "union block devices," or UBDs, "are effectively low-level drivers that operate as an interface between the first and second storage devices and the file system of each compute node." *Id.* at 4:41–45. Because these UBDs "operate below the file system, they are concerned merely with the blocks of data themselves, rather than files they form," making the system "completely file system, and thus operating system, independent." *Id.* at 4:48–51.

The '844 Patent—titled *Root Image Caching and Indexing for Block-Level Distributed Application Management*—is a continuation-in-part of the '282 and recites additional elements "for … block-level distributed application management," including "caching blocks of the root image that have been accessed by at least one compute node" and "receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes." '844 Patent at 2:35–48. Like the '282 Patent, the '844 Patent relies on *block*-layer flows (e.g., storing blocks of the root image and leaf images, merging blocks, and delivering the environment via a low-level driver), explaining that "[b]y storing data at the block level, embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent." *Id.* at 7:58–62, Fig. 3A/3B. Because "the merging occurs at an operational level between the file system … and the [root, leaf, and cache] storage," the compute node sees "one cohesive image rather than a base image plus its additions, deletions, and modifications." *Id.* at 8:18–26. "Thus, the file system actually seen by the compute node is a product of merging the root image portion in the leaf image portion together at the block level." *Id.* at 9:44–47. "Thus, by operating at the block level, embodiments of the present disclosure provide file system and operating system independent systems and methods for distributing an application environment to a compute node." *Id.* at 10:1–4.

The '282 and '844 Patents trace their lineage to U.S. Application No. 11/026,622 (the "'622 Application"), entitled *Branching Store File System*, (*see* Ex. A-3), which disclosed the same general concept of distributing application environments, but implemented at the *file system* level. In the '662 Application, "[a] filter operates between the compute nodes and the file system(s), which merges the changes recorded on the leaf images with the root image and delivers the result to the appropriate compute node," so that it appears to each compute node that "it is running its own unique and cohesive instance of the application environment." '282 Patent at 1:7–11, 1:58–2:12; '844 Patent at 1:7–13, 2:13–24. A compute node "mounts at least a portion of the base image … and the change volume," and writes are handled via file-level copy-on-write ("the entire original file is copied from the root image … into the change volume … [and] the write operation is then performed on the copy"). Ex. A-3 at [0037]–[0038].

In such embodiments, "a separate version of the system must be created for each unique operating system because data is stored at the file system level (i.e., on a 'per file basis')." '844 Patent at 2:24–32. The '662 Application teaches a file-system-level overlay (filter-mediated, mount-based, file-level copy-on-write), whereas the asserted '282/'844 claims are directed to block-layer operation under the file system (union block device/low-level driver, block/sector merging). The patentees' and the patents' distinction between the "layers" at which date is stored and merged is the crux of the parties' claim construction disputes.

### 1. "root image" ('844 Patent at claim 7; '282 Patent at claims 1 and 15)

| Defendant | Plaintiff |
|---|---|
| a base image of the application environment operating at the block level below the file system | plain meaning |

The parties agree that a "root image" is a base image of the application environment; the parties dispute whether it operates at the block layer, below the file system level.

The claim language fixes that layer. Claim 15 of the '282 patent recites "storing blocks of a root image of a compute node on a first storage unit," where "the blocks comprise sections of data, and … a file of the root image comprises at least one block," and then "merging the blocks of the root image … with the blocks of the leaf image … to create the application environment," with sector-level handling by the driver. Claim 7 of the '844 Patent likewise recites "storing blocks of a root image of said compute nodes on a first storage unit," and dependent claim 11 recites "merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments." As discussed below, by drafting the claims to focus on storing and merging *blocks* of the root image (and leaf), the patentee confirmed that the root image is manipulated at the block level, *not* at the file system level.

The specifications clarify and cement the block-layer operation. Figure 2 of the '844 Patent is "a diagram of a system 200 for root image caching and indexing in a block-level distributed application environment," '844 Patent at 5:12–14, and the '282 Patent presents the same architecture in Figure 1. Figure 3A of the '844 Patent depicts a flowchart for root image caching and indexing "in a block-level distributed application environment," and the '282 Patent's Figure 3 and corresponding text (5:61–63) similarly illustrate storing blocks of a root image and merging those blocks with leaf-image blocks to create the application environment. The figures and the accompanying descriptions in the specification teach block-layer operations.

The specification contrasts block-level operations on the root image with file-level operations, explaining with a concrete example that a particular file in the root image may comprise twenty blocks of data, and that modifying only a subset of those blocks results in storing only the changed blocks in the leaf image, plus minimal overhead. *See* '282 Patent at 4:33–40; '844 Patent at 5:51–58. That is block-granularity composition, not file-level copy-up.

The patents repeatedly emphasize that the claimed inventions "operate beneath the file system" and are "file system and operating system independent." *See, e.g.*, '282 Patent at 4:45–51, 5:67–6:2, 6:38–41; '844 Patent at 5:63–6:3, 7:58–62, 10:1–4. The teachings are explicit: "[b]y storing data at the block level, embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent." '282 Patent at 5:67–6:2; '844 Patent at 7:58–62. The patents present the block-layer operations as a deliberate departure from earlier, file-system-level approaches described in the '662 Application, and tout that it "provid[es] file system and operating system independent systems and methods for distributing an application environment to a compute node." '282 Patent at 5:67–6:2, 6:38–41; '844 Patent at 7:59–62, 10:1–4. Because the claims and the specification define the operative level as *block*-level—i.e., beneath the file system—that distinction controls. *See AstraZeneca*, 633 F.3d at 1051–52.

Because the intrinsic record consistently ties the handling of the root image to block-level storage and merging beneath the file system, the term cannot encompass file system-level implementations. Permitting IV to suggest otherwise would invite improper claim construction before the jury. The Court should therefore construe "root image" to mean *a base image of the application environment operating at the block level below the file system*.

### 2. "leaf images" ('844 Patent at claim 7; '282 Patent at claims 1 and 15)

| Defendant | Plaintiff |
|---|---|
| a node-specific image of the application environment operating at the block level below the file system | plain meaning |

The parties' dispute whether by claiming block-layer storage of leaf images, the patentees distinguished systems operating at the file system layer. The claim language should be dispositive on this issue. For example, claim 7 of the '844 Patent requires "storing leaf images for respective nodes on respective second storage units," and defines "said leaf images [as] including only

additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes."

The claim language thus dictates block-layer operations. Dependent claim 11 confirms this by requiring "merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments," underscoring that the merge operation occurs at the block layer and that each leaf image produces its own per-node application environment when merged. The '282 Patent mirrors the block-layer architecture: system claim 1 recites "a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image," and method claim 15 requires "storing a leaf image comprising new data blocks and changes to the blocks of the root image" and "merging the blocks of the root image with the blocks of the leaf image" to "create the application environment" delivered "to the compute node." Thus, the claims specify (i) the operative unit is *blocks* (not files), and (ii) each leaf image is *node-specific* ("respective … compute nodes"; "respective leaf images"; "cohesive respective application environments").

The specifications confirm "when a compute node … makes changes involving the root image, modifications are made to that compute node's leaf image," and that "only the specific blocks that are changed are stored in the leaf image." '282 Patent at 4:31–40; '844 Patent at 5:49–58. The patents illustrate this with an example: if a file in the root image comprises twenty blocks and the node modifies only blocks 4–9, then only blocks 4–9—along with minimal overhead—are stored in that node's leaf image, not the unchanged blocks 1–3 and 10–20. That is block-level copy-on-write behavior to avoid duplication of unchanged data.

The patents further teach a union block device—a low-level driver—that "operat[es] beneath the file system," merges blocks of the root and leaf images, and presents the compute node with "one cohesive image" that is "file system and operating system independent." *See, e.g.*, '282 Patent at 4:45–51, 5:67–6:2, 6:38–41; '844 Patent at 5:63–6:3, 7:58–62, 10:1–4. By storing and merging at the block level, the inventions deliberately depart from earlier file-system-level "branching store" approaches disclosed in the '662 Application, which used a filter and mount-based, file-level copy-up semantics and required per-OS implementations. In the asserted patents, by contrast, the merger occurs at the block layer between storage and the file system; the file system sees only the unified result. Within this design, a "leaf image" is necessarily a block-level construct.

Any broader reading would conflict with the claims' "only" limitation and their express exclusion of unchanged root blocks, and would erase the patents' central distinction from the prior file-system-level overlay. Nothing in the intrinsic record supports a file-level implementation or a leaf image that copies unmodified root data. The Court should therefore adopt Southwest's construction: a "leaf image" is *a node-specific image of the application environment operating at the block level below the file system*.

3.    **"merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments" ('844 Patent at claim 11; '282 Patent at claim 15)**

| Defendant | Plaintiff |
|---|---|
| combining the root image and the leaf image at the block level below the file system | plain meaning |

Claim 11 of the '844 Patent depends from claim 7 and recites "merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments." Similarly, claim 15 of the '282 Patent requires "merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage

unit to create the application environment." Read in light of the specifications, these limitations require that the claimed merging occur beneath the file system—i.e., at the block level—thereby enabling file system and operating system independence.

The specifications describe the purported invention as improving cluster computing "by utilizing a root-leaf system application environment storage, [which] allow[s] creation of boot images on the fly without significantly diminishing bring-up time." '844 Patent at 2:52–56; '282 Patent at 2:46–53. They explain that "creating a new boot image does not require copying the contents of the root image," but instead "involves registering a new UBD with the system, which occurs very quickly." '844 Patent at 2:40–65; '282 Patent at 2:53–55. As described, UBDs are low-level drivers operating at the block level beneath the file system. The specifications confirm: "Because UBDs … operate below the file system, they are concerned merely with the blocks of data themselves, rather than files they form. As a result, system [] is completely file system, and thus operating system, independent." '844 Patent at 5:66–6:3; '282 Patent at 4:48–51. Put differently, "the file system actually seen by the compute node is a product of merging the root image portion and the leaf image portion together at the block level." '844 Patent at 9:44–47.

Non-asserted claim 23 of the '844 Patent explicitly states what the other claims implicitly require—that "merging" occurs "***at the block-level***." *Id.* at 13:15–16. The flow diagrams confirm Defendant's point. Step 330 of Figure 3A of the '844 Patent shows *block-level* merging of the root and leaf images to create an application environment. '844 Patent at 8:13–15. Likewise, the '282 Patent's Figure 3 and corresponding text describe "a process 300" showing "stor[ing] blocks of a root image of a compute node" and "merg[ing] the blocks of the root image with the blocks of the leaf image to create an application environment." '282 Patent at 5:61–63, Fig. 3. The result is that while the compute node "has access to its own unique version of an application," "a separate and

complete boot image is not actually stored for the compute node." '844 Patent at 8:18–25; '282 Patent at 6:13–16. Because both the claim language and the specifications repeatedly and unambiguously teach that the root and leaf images are combined at the block level beneath the file system, the Court should adopt Southwest's proposed construction.

### 4.  "union block device" ('282 Patent at claims 1 and 15)

| Defendant | Plaintiff |
|---|---|
| drivers operating at the block level below the file system | plain meaning |

Claim 1 of the '282 Patent recites "a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, wherein the union block device comprises a driver," and further specifies that "the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit." This language confirms that the union block device is a driver operating beneath the file system, at the block level, to merge root and leaf blocks.

The patent characterizes the union block device (UBD) as a low-level, block-layer mechanism, explaining that the "union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the leaf image stored on the second storage unit." '282 Patent at 2:27–31. Fig. 1 depicts the UBD between the compute node and the storage units, mediating access at the block level. *Id.* at 3:64–4:8. Critically, the patent expressly distinguishes UBDs from file-based approaches: "Because UBDs … operate below the file system, they are concerned merely with the blocks of data themselves, rather than files they form." *Id.* at 4:48–50. The same theme is reiterated throughout: "By storing data at the block level, embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent." '844 Patent at 7:58–62; *see also* '282 Patent at 6:39–42

("Thus, by operating at the block level, embodiments … provide a file system and operating system independent system and method for distributing an application environment to a compute node.").

The prosecution history unequivocally confirms this construction. During prosecution, the patentees amended claim language to "further define the union block device as a 'low level driver,'" citing paragraph [0020] of the specification as support and explaining that such low-level drivers operate on the individual blocks that make up files (data) within the root and leaf images, as recited. *See* Ex. A-4 at 8. This amendment and the accompanying remarks limit the UBD to a block-level driver, not a file-level or higher-level component.

In view of the claims, specification, and prosecution history, "union block device" should be construed as drivers operating at the block level below the file system.

### A.  U.S. Patent No. 7,949,785

The '785 Patent (Ex. A-5)—titled *Secure Virtual Network System*—describes a virtual networking architecture that enables devices distributed across public and private networks (including behind NATs and firewalls) to communicate as if on a common private network. At a high level, a virtual network manager registers devices (via an agent), assigns each device a virtual address that identifies it within the virtual community, and provides name-resolution responses that supply the routing information needed to reach peers. *See, e.g.*, '785 Patent at Abstract, 5:48–60, 6:27–33, 12:8–14, Fig. 4. A core aspect is the Domain Name System (DNS) server interaction: when a first device requests communication with a second device, the manager's DNS server returns three data points—(1) a public-side IP address for a network route director that will forward traffic, (2) a private address for the destination device (when applicable), and (3) the destination's virtual address used for identification within the virtual community. *See, e.g.*, '785 Patent at 12:26–31, 14:34–38, 14:43–46, 31:28–32, Fig. 7, Fig. 24. Devices communicate using encapsulation/security appropriate to the overlay, but the addressing distinction—

physical/public/private versus virtual—is fundamental to the claimed architecture. *See, e.g.*, *id.* at 12:50–62, 13:25–27.

### 1. "network address" (claim 30)

| Defendant | Plaintiff |
|---|---|
| Internet Protocol (IP) address | plain meaning |

As described above, claim 30 identifies three distinct addresses returned by the DNS server: a "network address" for the network route director, a "private network address" for the destination device, and a "virtual network address" for that device. '785 Patent at 36:50–56. The question here is what the term "network address" itself denotes.

The specification and figures make clear that the "network address" is the public-side IP address used to reach the route director. Figure 7 (step 656) depicts the DNS response returning the public IP address for the route director, while Figures 7 and 24 consistently identify the returned "IP address for RD." *See id.* at 14:34–38, 14:43–46, 31:28–32. The patent never describes any non-IP form of network address, and the DNS context itself presupposes IP addressing.

The prosecution record reinforces this reading. In reexamination, the patentees explained that the DNS response includes a numeric IP address, describing the familiar DNS translation from a domain name to its corresponding IP address, telling the patent office that "the response from the DNS server includes a numeric IP address." Ex. A-6 at 12–13. The patentee explained: "A DNS request is responsible for resolving a domain name, such as www.example.com, into its corresponding IP address (e.g., 93.184.216.34) to enable devices to locate and communicate with the server hosting the desired resource." *Id.* at 12. Those statements confirm that "network address" means an IP address associated with the route director.

That is consistent with claim 30's use of three different terms—"network address," "private network address," and "virtual network address"—to reflect three different concepts. The intrinsic

13

confirms the "network address" is a routable IP address for the route director, the "private network address" is the local address within a private domain, and the "virtual network address" is an identifier within the overlay.

### 2. "distribute a virtual network address to the device" (claim 30)

| Defendant | Plaintiff |
|---|---|
| assigning a virtual address, different from an internet protocol or IP address, to identify the device within the virtual network | plain meaning |

Claim 30 requires that the register module "distribute a virtual network address to the device when the device is registered in the virtual network." '785 Patent at 36:43–47. The specification makes clear that this "virtual network address" is an identifier in a separate, non-routable logical space—the virtual address realm—used by members of the virtual community to identify one another, as opposed to public or private IP addresses used for physical routing. *See id.* at 12:50–62, 13:25–27, 5:48–60, 6:27–33. The patent distinguishes between (i) physical addressing (public/private IP) used for routing on underlying networks, and (ii) virtual addressing used for member identification within the overlay. *See id.* at 12:50–62, 13:25–27.

Claim 30 recites three items returned by the DNS server: "a network address" for the route director, "a private network address" for the destination device, and "a virtual network address" for that device. *Id.* at 36:50–56. The figures depict the same three fields. *See id.* at 14:34–46, 31:28–32, Fig. 7, Fig. 24. Treating "virtual network address" as just another IP address would collapse the triad and render claim language superfluous.

The specification explains that by assigning each member a virtual address, the system "creates" a virtual address realm that members use to identify and send communications to each other, while those same members can simultaneously inhabit different physical (IP) realms. *See id.* at 12:50–62. The point of this realm is to avoid conflicts with routable IP space and to enable

overlay communication independent of physical addressing. *See id*. at 13:25–27 (non-routable virtual addresses). That design only works if the distributed "virtual network address" is different in kind from IP.

Dependent claims reinforce that the distributed virtual address is tied to a specific device's identity within the community. Claim 35's join/leave logic and claim 37's maintenance of an association between a device and its virtual address confirm that the address is a persistent overlay identifier for that device, not a routable IP. *See id.* at claims 35, 37; *id.* at 36:57–37:12.

During prosecution, the patentees distinguished prior art that relied on corporate IPs or private non-routable IPs by emphasizing that the claimed approach configures a client with a virtual network address by which members identify one another in the community, in addition to any physical address. *See* Ex. A-7 at 20. That distinction is incompatible with a "virtual network address" being an IP address.

A "plain meaning" construction is unhelpful for a term that the patent itself cabins within a separate addressing realm and that the claims treat as a different field from both "network address" and "private network address." *See id.* at 36:46–56. The most natural, claim-consistent construction is the one Southwest proposes: the register module assigns a virtual address—not an IP address—to identify the device within the virtual community.

### 3.    "network route director" (claim 30)

| Defendant | Plaintiff |
|---|---|
| a publicly addressable device configured to route encapsulated packets to and from entities located in a private network portion of a virtual network | plain meaning |

Claim 30 requires the DNS server to "return a network address associated with a network route director." The term "Network Route Director" (NRD) is coined and has no ordinary technical meaning apart from the specification; thus, its scope is defined by the patent's own usage. *See* '785

Patent at 10:24–27, 11:9–18. The specification consistently characterizes the NRD as a device that "runs on the public side" of the Internet/NAT and enables communication with endpoints located in private address domains without firewall reconfiguration, forwarding encapsulated overlay traffic into and out of those private realms. *See id.* at 11:9–13, 13:51–59, 25:33–34, 32:53–59; *see also id.* at 15:6–7 (public IP address for the NRD included during setup).

The patent teaches that the NRD is publicly reachable—"on the public side"—and is identified to the communicating member by a public-side address returned in the DNS response. *See id.* at 14:34–46, 31:28–32, Fig. 7, Fig. 24. The NRD forwards encapsulated overlay traffic into and out of private address realms and performs re-encapsulation associated with traversal through NAT/firewalls. *See id.* at 13:51–59, 27:13–15, 28:26–27. Claim 30 and the figures depict the DNS server returning the NRD's public address together with the destination device's private and virtual addresses, positioning the NRD as the publicly addressed relay for reaching a device identified in the virtual address realm. *See id.* at 36:50–56, Fig. 7, Fig. 24.

The patentees confirmed this function during reexamination, stating "the problem of the current invention . . . is how to ***route*** through a route director to the virtual address." Ex. A-6 at 19 (emphasis added). This characterization of "the current invention" confirms that "network route director" must route packets to a virtual address. This is not a generic router or load balancer; it is the public-side relay for encapsulated overlay traffic directed to a device identified by a virtual address within the community.

Because "Network Route Director" is a coined term, a plain-meaning construction divorced from the specification is inappropriate. The intrinsic evidence supplies boundaries that require construction of NRD as *a publicly addressable device that routes encapsulated packets to and from entities located in a private network portion of the virtual network*.

B.  **U.S. Patent No. 8,407,722**

The '722 Patent (Ex. A-8)—titled *Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network*—concerns "transferring information for remotely updating content at client devices through the digital networks." '722 Patent at 1:24–27. The patent describes a publish-subscribe messaging system in which client devices receive web pages containing "live objects," which are "real-time dynamically-updateable objects … identified by an object identifier, or object ID." *Id.* at 5:27–31. "When the clients receive live objects, the clients identify the object IDs associated with the objects and register the object IDs with the routing network." *Id.* at Abstract. The routing network "maintains a registry indicating which clients have registered for which object IDs," and selectively forwards update messages to those clients. *Id.* at 5:32–48. When a gateway receives update messages from an input source, "the gateway identifies the categories of the messages and routes the messages to the nodes of the types to which the categories are mapped." *Id.* at 3:43–46; *see also id.* at Abstract.

1.  **"respond to the live object of the data representation by determining an object identifier (ID) of the live object" (claim 14)**

| Defendant | Plaintiff |
|---|---|
| parse the data representation to identify an object identifier of the live object | plain meaning |

The dispute is whether the claimed method requires the *client device* to examine the "data representations" to identify the object ID of the live object. Rather than adopting a "plain meaning" construction and leaving it to the experts to argue claim construction to the jury, the Court should construe this phrase to require the client device to parse the provided data representation (e.g., a web page or other markup-based document) to determine the object ID of a live object.

Claim 14 recites providing "a data representation to a client device," where the "data representation includes at least one live object recognizable by the client device," and the client

device "*respond[s] to the live object of the data representation by determining an object identifier (ID) of the live object ... and [registers] for updates of the live object with the routing network.*"

The specification uses "web page" broadly to encompass "other representations of data served by the server ... regardless of whether these data representations include characteristics of conventional web pages," including "application programs ... such as spreadsheet or textual (e.g., word processing) data, etc." *Id.* at 6:39–60. Thus, the "data representation" is the client-side structure (a web page or other delivered representation) that can contain live objects.

The specification explains what "live objects" are and how their identifiers appear in the provided representation: "The web pages contain one or more 'live objects,' which are designated to be real-time dynamically-updateable objects. Each live object is identified by an object identifier, or object ID." *Id.* at 5:27–31. In concrete embodiments, "the information provider 108 encodes the object ID in an object's corresponding HTML 'ID' attribute," and "the object ID identifies a point (i.e., a node in a tree) in a Document Object Model (DOM) representation of a web page or other document at the client 114." *Id.* at 8:28–30, 9:13–15. Clients "do not need to have any a priori knowledge of object IDs—they 'discover' which IDs they should register when they receive the web pages 118 from the server 112." *Id.* at 5:66–6:2.

Critically, the specification describes how the client determines the identifiers: "to register object IDs, the activation module 124 preferably parses 610 the web page 118 received from the server 112 and identifies the objectIDs of the live objects." *Id.* at 14:28–43. The same passage makes clear this is a client-side operation performed by the activation module and depicts it at box 610 of Figure 6, and it also lists variants that still involve the client identifying which IDs to register: the module may "identif[y] only a subset of the objectIDs," "a list of object IDs may be

pre-encoded in the web page … thereby enabling easy identification by the activation module," or "a user of the client 114 selects the object IDs to register." *Id.*

The intrinsic record therefore confirms that the limitation requires the client device to parse the provided data representation to identify the embedded object ID(s). Southwest's construction captures that operation and resolves the parties' dispute; leaving "plain meaning" to expert testimony would improperly defer claim scope to the jury.

### 2. "register for updates of the live object with the routing network" (claim 14)

| Defendant | Plaintiff |
| --- | --- |
| communicate to the routing network a vector containing the identified object identifier | plain meaning |

The parties dispute whether this registration limitation requires the client to communicate the identified object ID to the routing network.

Claim 14 requires that the "client device," after identifying an object ID of the live object, "register for updates of the live object with the routing network." This is the same thing described in the abstract where the client receives a live object and in response the client identifies the object ID associated with the object and "register[s] the object IDs with the routing network." '722 Patent at Abstract. The specification explains that "[e]ach live object is identified by an object identifier, or object ID," and the routing network "maintains a registry indicating which clients have registered for which object IDs." *Id.* at 5:30–31, 5:34–36.

The specification teaches that "[t]he client 114 executes 220 the activation module 124, which identifies the object IDs of the live objects at the client and registers 222 the object IDs with the routing network 110." *Id.* at 11:33–35. Figures 2 and 6 depict the same two-step client-side operation—identify the IDs, then register them with the network—confirming that "register" is an active, client-initiated transmission.

The specification teaches that the activation module "uses the connection between the client 114 and routing network 110 to register 614 the object IDs by communicating to the routing network 116 *a vector (e.g., a list or array) containing the identified object IDs*." *Id.* at 14:55–59 (emphasis added). To traverse a firewall, "*the activation module packages the vector containing the identified object IDs* into a string, referred to as 'object data,' and sends it to the routing network as part of an HTTP message." *Id.* at 14:59–63 (emphasis added). Upon receipt, "the routing network … extracts the object data and updates the registry to indicate that the client has registered for the identified objects." *Id.* at 15:1–4. In other words, in this claim, "register … with the routing network" is not an abstract concept; it is the client's communication of a vector containing the identified object IDs that the network uses to update its registry.

### 3.   "input source" / "identify a category of the update message based on the input source" (claim 14)

| Defendant | Plaintiff |
|---|---|
| identify a category of the update message based on the information provider or dynamic content provider but not on the category/topic of the message content | plain meaning |

This limitation should be construed to require publisher-based categorization: the gateway identifies a category of the update message based on the input source (the information provider and/or dynamic content provider), rather than on the category/topic of message content.

The specification provides explicit lexicography for "input source." It defines the term as "the information provider or a dynamic content provider (generically referred to as an 'input source')." '722 Patent at 3:15–16. It likewise references an "information provider 108/dynamic content provider 116 (generically referred to as an 'input source 210')," and the "input source 210, i.e., the information provider 108 and/or dynamic content provider 116 …." *Id.* at 11:22–24, 13:26–28.

From those passages, the specification teaches that the "input source" is the information provider and/or dynamic content provider, not a subject-matter category.

Consistent with that definition, the specification states that "the input source 210 sends … an update message to the routing network … in order to change a property of a live object at the client," and that "the information provider 108 and/or the dynamic content provider 116 provides update messages to the routing network 110." *Id.* at 11:38–40, 9:50–54. This usage confirms "input source" denotes the publisher/producer—setting up the claim requirement that category be identified "based on the input source."

Claim 14 then requires the gateway "to identify a category of the update message based on the input source," and to route by mapping categories to node types. The specification summarizes this operation: "When a gateway receives messages from input sources, the gateway identifies the categories of the messages and routes the messages to the nodes of the types to which the categories are mapped." *Id.* at 3:43–50. Thus, this particular limitation requires the gateway to assign a category for an update message based on the input source, not what the message is about.

The specification identifies this "input source" categorization as one of several categorization techniques: "There are multiple ways to assign the messages into categories. One way is to assign all messages from a given input source … into a certain category. Another way is to explicitly specify the category in the object ID for the message. Yet another way is to utilize a hashing function or lookup table to partition messages into categories based on object IDs or other values." *Id.* at 18:52–58. This claim focuses on categorization "based on the input source," as opposed to other approaches.

The prosecution history confirms this distinction. In distinguishing prior art, the applicants contrasted their claims—which identify a category "based on the input source"—with systems that

identify categories "based on the category/topic of the message content." Ex. A-9 at 18–19. They repeatedly emphasized that the claims recite "different distinguishing features, i.e., an updated message is identified based on the input source," whereas the prior art "merely teaches using a category/topic of message content." Ex. A-10 at 23. Those statements confirm that content/topic-based categorization is outside the claimed scope.

Based on the specification's definition of "input source," the claim language, the teaching in the specification, and the prosecution history, the Court should adopt a construction that requires categorization of the update message based on the information provider, not the category/topic of the message content.

Dated: October 14, 2025

Respectfully submitted,

*/s/ S. Wallace Dunwoody*
Michael C. Wilson
Texas Bar No. 21704590
mwilson@munckwilson.com
S. Wallace Dunwoody
Texas Bar No. 24040838
wdunwoody@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
2000 McKinney Avenue, Suite 1900
Dallas, Texas 75201
(972) 628-3600
(972) 628-3616 fax

David G. Henry
Texas Bar. No. 09479355
dhenry@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
510 Austin Avenue, Suite 3100
Waco, Texas 76701
(254) 362-2300
(254) 362-2304 fax

Tri T. Truong
Texas Bar No. 24102969
ttruong@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
807 Las Cimas Parkway, Suite 300
Austin, Texas 78756
737-201-1600
737-201-1601 fax

*Attorneys for Southwest Airlines Co.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 14, 2025, the foregoing document has been

served on all counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/ S. Wallace Dunwoody*
S. Wallace Dunwoody

23