# EXHIBIT A-6

## REMARKS

### I.     Status of Claims

Claims 30 and 34 of U.S. Patent No. 7,9497,85 ('785 Patent) are under reexamination. Claims 1-29, 31-33, and 35-90 are not subject to this reexamination proceeding.

Pursuant to 37 C.F.R. 1.530(e), Patent Owner identifies the status of all patent claims as follows:

Claims 30 and 34: original and under reexamination;

Claims 1-29, 31-33 and 35-90: original and not under reexamination.


### II.     Example of the Invention

The '785 Patent states that "[a] basic overview of the system is shown in FIG. 4." ('785 Patent, 9:9). Specifically, Figure 4 (reproduced below) shows a Virtual Community Network (VCN) that allows devices, such as A and B, to communicate as if they were on the same physical local network.

Patent Owner: Intellectual Ventures I LLC
Application No.: 90/019,519



**Fig. 4**

In an example, the '785 Patent explains that, "[a]s shown in FIG. 4, A, B and X may all make direct connections to each other through communications within the virtual domain. In FIG. 4, dashed lines represent direct communication paths seen to applications running on A, B and X, all "seeing" the virtual addresses of each other and communicating with each other using the application's IP interface." ('785 Patent, 9:36-41). In addition, the '785 Patent explains that "A and B have dynamic or static private IP addresses. Computer or device X is coupled directly to the public Internet and has a public IP address."('785, 9:15-17). The interface between "X.Cox.com IPx Routable" and "Virtual Domain X.Vpn" is an example of a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public network address. In the example of Figure 4, "X.Vpn" is the domain name defining the virtual network. In this example, the interface for accessing the virtual network from outside the virtual network uses

2

**Patent Owner:** Intellectual Ventures I LLC
**Application No.:** 90/019,519

"X.Cox.com IPx Routable" which has a public network address as identified by the top level domain suffix ".com".


## III.    Response to Claim Rejections

<u>Issue 1:</u>

- Claims 30 and 34 were rejected under 35 U.S.C. §103 over U.S. Patent No. 7,036,143 to Leung et al. (hereinafter, "Leung") in view of Patent No. 7,155,518 by Forslow (hereinafter, "Forslow") and U.S. Publication No.: 2003/0028671 by Mehta (hereinafter, "Mehta").

Patent Owner respectfully traverses the foregoing obviousness rejections and submits that Claims 30 and 34 recite features not taught, suggested, or otherwise yielded by the primary reference, Leung, or any proper combination of the cited references. Accordingly, the Patent Owner submits that the claims are patentable for at least the following reasons.

### A.    Mehta, Forslow, And Leung, Alone Or In Combination, Fail To Teach Or Suggest A "Domain Name" As Recited In The Challenged Claims.

Claim 30, recites, in part:

> a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public network address;

None of the cited references teach or suggest "a virtual network that is defined by a domain name having an associated public network address," as recited in Claim 30.

Patent Owner: Intellectual Ventures I LLC
Application No.: 90/019,519

The Office Action relies on Leung for this limitation. However, Leung makes no mention of a "domain name" in any respect, let alone "a domain name having an associated public network address." In order to fill this gap in Leung, the Office Action argues that, "A POSITA would have understood that the subnetwork address obtained from the Internet service provider disclosed in Leung is based on the domain name of the public network" (Non-Final Office Action, Pg. 12). The Office Action cites no evidence in support of this assertion.

It is the Examiner's burden to demonstrate that each and every element of Claim 30 is met by the relied on references, either expressly or inherently. The Office Action does contend that Leung expressly discloses that its subnetwork address obtained from the Internet service provider is "based on the domain name of the public network." That is because Leung makes no mention of a "domain name" -- the term appears nowhere in the reference. Nor does the Office Action allege (let alone demonstrate) that this feature is inherent in Leung. Inherency requires that the limitation _must_ be present in the reference, which is not the case here. The fact that the feature is possibly present in the reference is insufficient to demonstrate inherency.

The Patent Owner respectfully submits that obtaining a network address from an Internet service provider (as disclosed in Leung) does not inherently require that such network address is associated with, or based on, a domain name. More specifically, the assignment of an IP address by an ISP does not inherently require a "domain name." For example, in a case where an ISP assigns the network/

4

subnetwork address of "192.168.1.10" to a customer, there is no requirement the address be associated with, or based on, a domain name -- and ISP's routinely assign network/subnetwork addresses that are not based on, or associated with, a domain name  (See Ex. 2001, ¶35).

The Microsoft Computer Dictionary 5th Ed (Ex. 2002) defines a "domain name" as:

> An address of a network connection that identifies the owner of that address in a hierarchical format: server.organization.type. For example, www.whitehouse.gov identifies the Web server at the White House, which is part of the U.S. government (Ex. 2002, Pg. 3).

Similarly, as explained by ""What's In A Domain Name?" A Critical Analysis Of The National And International Impact On Domain Name Cybersquatting" (Ex. 2003):

> For people to find a business web page on the Internet, individuals need to know the business' Internet address. These addresses are extremely important tools for communication. By typing in a certain series of letters, numbers, and symbols, referred to as an Internet domain name, an Internet user gains access to a desired website (Ex. 2003) (internal citations omitted).

Accordingly, a domain name is a human-readable address that identifies a specific location on the Internet, such as a website or an online service. It serves as an *alias* for an IP address, which is the numerical address (e.g., "192.168.1.10") computers use to locate resources on a network. Domain names simplify access to online resources by allowing users to type a recognizable name, like example.com,

instead of a complex numerical IP address. They are structured hierarchically and consist of multiple parts separated by dots, such as www.example.com, where www is the subdomain (optional), example is the second-level domain, and com is the top-level domain (TLD). The Domain Name System (DNS) translates these domain names into their corresponding IP addresses, enabling computers to locate and communicate with the correct servers or devices (see Ex. 2001, ¶32-34). However, there is no requirement that a numerical IP address such as that assigned by the ISP in Leung (e.g., "192.168.1.10") be associated with a domain name maintained by a DNS (Ex. 2001, ¶35).

The Microsoft Computer Dictionary 5th Ed (Ex. 2002) defines an "IP Address" as:

> Short for Internet Protocol address. A 32- bit (4-byte) binary number that uniquely identifies a host (computer) connected to the Internet to other Internet hosts, for the purposes of communication through the transfer of packets. An IP address is expressed in "dotted quad" format, consisting of the decimal values of its 4 bytes, separated with periods; for example, 127.0.0.1. The first 1, 2, or 3 bytes of the IP address identify the network the host is connected to; the remaining bits identify the host itself. The 32 bits of all 4 bytes together can signify almost 232 , or roughly 4 billion, hosts (A few small ranges within that set of numbers are not used)  (Ex. 2002, Pg. 4).

Accordingly, a POSITA would understand an IP address to be a unique numerical identifier assigned to each device connected to a network that uses the Internet Protocol for communication. It serves two primary purposes: identifying the host or network interface and providing the location of the device within the network, enabling data to be sent and received (see Ex. 2001, ¶33).

6

Patent Owner: Intellectual Ventures I LLC
Application No.: 90/019,519

In computer networking, IP addresses are obtained through either dynamic allocation or static assignment, depending on the network configuration. Dynamic allocation, the most common method, is managed by a Dynamic Host Configuration Protocol (DHCP) server. When a device connects to a network, it sends a request to the DHCP server, which assigns an available IP address from a predefined pool. This process is automated and ensures that devices on the network are assigned unique IP addresses without manual intervention. The assigned address is typically leased for a specific duration, after which the lease may be renewed, possibly resulting in a new IP address. This method is widely used in home and enterprise networks due to its simplicity and efficiency (see Ex. 2004).

Alternatively, an IP address can be obtained through static assignment, where a specific address is manually configured on the device. This ensures that the IP address remains consistent and is commonly used for devices that require reliable identification, such as servers, printers, or security cameras. For external-facing devices on the Internet, Internet Service Providers (ISPs) assign public IP addresses, which can be either static or dynamic. Additionally, modern networks may use either IPv4 or IPv6 protocols, with IPv6 designed to address the limitations of IPv4's finite address space (see Ex. 2004).

In neither the static nor the dynamic cases is a domain name required. Instead, when a device connects to a network, the DHCP server assigns it a dynamic IP address according to IETF RFC 2131 (see Ex. 2005). Nowhere does IETF RFC 2131 require that obtaining an IP address require registration with or the existence of a

domain name.  In fact, the vast majority of IP addresses (including the laptop utilized to write this document) have been assigned IP addresses and are not associated with a domain name  (see Ex. 2001, ¶34).

The same hold true for IP address assigned by ISPs. ISPs assign IP addresses to devices connecting to their networks using methods that depend on the type of connection the user's needs. Most ISPs rely on a DHCP server to assign numerical IP addresses dynamically. When a device connects to the network, it sends a request to the DHCP server, which assigns an available numerical IP address from the ISP's pool along with configuration details like the subnet mask, gateway, and DNS servers. These addresses are leased for a set period, after which the device may either renew the lease or receive a new IP address. In some cases, such as businesses hosting servers or running services requiring remote access, ISPs assign static IP addresses that remain constant. In this case, the ISP manually reserves a numeric IP address for the customer's account and configures it in their network infrastructure (see Ex. 2006). However, in neither case, does the assignment of the numeric IP address by the ISP require an association of the numeric address with a domain name (see Ex. 2001, ¶35).

Therefore, Leung's disclosure that an ISP assigns a public IP address does not inherently teach "a virtual network that **is defined by a domain name** having an associated public network address," as recited in claim 30. As explained by the Federal Circuit, the use of inherency, "a doctrine originally rooted in anticipation, must be carefully circumscribed in the context of obviousness" and "[t]he mere fact

that a certain thing may result from a given set of circumstances is not sufficient to establish inherency" (*Par Pharm., Inc. v. TWi Pharm., Inc.*, 773 F.3d 1186, 1194-95 (Fed. Cir. 2014)) (internal markings and citations omitted). The Court has "emphasized that the limitation at issue necessarily must be present in order to be inherently disclosed by the reference" (*Southwire Co. v. Cerro Wire LLC*, 870 F.3d 1306, 1310-11 (Fed. Cir. 2017)) (internal citation omitted). Therefore, obviousness cannot be established by the mere fact that something may happen inherently. Instead, in the cited reference, the alleged feature must necessarily be present.

Here, as Dr. Noubir explains "that the assignment of IP addresses is completely unrelated to the existence of a domain name. Therefore, there is nothing required in the assignment of an IP address by an ISP to a device that requires the addressee to have a domain name or even be a member of a domain" (Ex. 2001, ¶35).

Further, the '785 Patent makes clear that the assignment of an IP addresses (IPa, IPb and IPx) is completely independent of domain names (X.vpn) (see Fig 4 above). Therefore, Leung does not inherently teach "a virtual network that **is defined by a domain name** having an associated public network address," as recited in the claim 30.

Further, Leung's teaching of a VPN does not inherently require a "domain name." The Microsoft Computer Dictionary 5th Ed (Ex. 2002) defines a "Virtual Private Network" as:

> Nodes on a public network such as the Internet that communicate among themselves using encryption technology so that their messages are as safe from being intercepted and

understood by unauthorized users as if the nodes were connected by private lines (Ex. 2002, Pg. 6).

Accordingly, a POSITA would understand that a Virtual Private Network (VPN) is a secure communication method that creates a connection between a user's device and a remote server over the Internet to replicate the functionality of being connected by a physical wire. The Office Action has proffered no explanation for why computers connected via VPN inherently require a domain name. In fact, the majority of computer networks operate without a domain name. As Dr. Noubir explains, "[t]here is absolutely nothing about a VPN that requires the existence of a domain or the connecting device to have a domain name" (Ex. 2001, ¶36).

Therefore, a POSITA would appreciate that the VPN taught in Leung does not inherently require "a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public network address."

The suggested additions of Mehta and Forslow do not cure the shortcomings of Leung. The Office Action does not allege, nor do Mehta and Forslow teach a "virtual network that is defined by a domain name having an associated public network address" as recited in claim 30. As a result, Mehta and Forslow, alone or in combination with Leung, fail to teach or suggest every feature recited in claim 30.

Therefore, a *prima facie* case of obviousness has not been established because the combination of the cited references fails to yield the features recited in the claims.

For at least the foregoing reasons, it is respectfully submitted that claim 30 is allowable over Mehta, Forslow, and Leung.

Patent Owner: Intellectual Ventures I LLC
Application No.: 90/019,519

Claim 34 is directly dependent upon claim 30, and the Patent Owner submits the claim is allowable over the cited references of record based on at least its dependency.

Based on at least the arguments presented above, the withdrawal of the 35 U.S.C. §103 rejections of the claims are respectfully requested.

**B.    Mehta, Forslow And Leung, Alone Or In Combination, Fail To Suggest A DNS Server As Recited In The Challenged Claims.**

Claim 30, recites, in part:

> a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device.

None of the cited references teach or suggest "a DNS server for the virtual network that is configured to receive a DNS request" and "return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device," as recited in claim 30.

Instead, as the Office Action observes, "Leung does not expressly disclose such a DNS server" (Non-Final Office Action, Pg. 26). Accordingly, Leung does not teach a DNS server for the virtual network that is configured to receive a DNS request and "return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual

11

network address associated with the second device," as recited in claim 30. Therefore, Leung fails to teach or suggest every feature recited in claim 30.

The suggested addition of Forslow does not cure the shortcomings of Leung. The Office Action alleges that "A POSITA would have understood that Forslow's mobile service manager 7 functions as a DNS server by receiving HTTPS requests from mobile nodes 3a and/or 3b and returning "user fully qualified domain name 155b/155a, the mobile node 3 private IP address (10.0.0.1) and the virtual home agent's 1a/1b public IP address (204.8.9.1 and 204.8.8.1 respectively)" (Non-Final Office Action, Pg. 26). The Patent Owner submits that Forslow's mobile service manager 7 does not function  as a DNS server that "is configured to receive a **DNS request**".

Forslow states that "the mobile nodes 3 a and 3 b ... retrieve a list of workgroup members 26 by doing **HTTPS requests** 22 a and 22 b to the mobile service manager 7 and its portal" (Forslow, 10:7-10). However, HTTPS requests are fundamentally different from DNS requests.

The fact that a server receives an HTTPS request and resolves an IP address does make the sever a "DNS server" or the request a "DNS request," as claimed.  . A DNS request is responsible for **resolving a domain name**, such as www.example.com, into its corresponding IP address (e.g., 93.184.216.34) to enable devices to locate and communicate with the server hosting the desired resource. Significantly, **a DNS request includes the domain name to be resolved**, and the

12

**Patent Owner:** Intellectual Ventures I LLC
**Application No.:** 90/019,519

response from the DNS server includes a numeric IP address. By contrast, the HTTPS request relied on from Forslow **lacks any domain name**.

The primary protocol used in the Domain Name System (DNS) is the User Datagram Protocol (UDP), which operates on port 53. UDP is a lightweight and efficient protocol that allows DNS queries and responses to be transmitted quickly without establishing a persistent connection. DNS requests are small and efficient, typically consisting of a query for a specific record type (e.g., A, AAAA, CNAME, MX) and a server response containing the requested information. Query latency is further reduced through caching at multiple levels, including local resolvers, ISP-level servers, and content delivery networks (CDNs) (see Ex. 2007)(see Ex. 2001 ¶40).

In contrast, HTTPS requests are designed for secure communication between a client, such as a web browser, and a server, using the HyperText Transfer Protocol over an encrypted SSL/TLS connection. HTTPS operates at the application layer and relies on TCP at the transport layer to ensure reliable data delivery, typically over port 443. The SSL/TLS handshake, which occurs at the start of an HTTPS session, establishes a secure channel by negotiating encryption algorithms, exchanging certificates, and deriving session keys. This process ensures confidentiality by encrypting data, integrity by detecting tampering, and authentication by verifying the server's identity. HTTPS requests involve more complex and voluminous data exchanges compared to DNS, encompassing HTTP headers, cookies, query parameters, and the encrypted payload, which can include sensitive user data or website content. This added complexity increases latency, as the TCP three-way

handshake and the SSL/TLS setup introduce additional overhead (see Ex. 2008) )(see Ex. 2001 ¶41).

Accordingly, as explained by Dr. Noubir "a POSITA would appreciate that HTTPS requests and DNS requests are completely different things. For example, the different types of requests operate on different ports, require/ don't require a persistent connection, and perform completely different functions" (Ex. 2001, ¶42). Therefore, Forslow's disclosure of a server that handles HTTPS requests is irrelevant to "a DNS server for the virtual network that is configured to receive a DNS request" and "return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device," as recited in the claim 30.

In fact, Forslow is wholly silent with regard to any mention of DNS. Instead, Forslow explains that "The virtual home agents 1 a and 1 b are using the lightweight directory access protocol (LDAP) 25 to retrieve the extranet workgroup configurations" (Forslow, Col. 10:57-60).

The Microsoft Computer Dictionary 5th Ed (Ex. 2002) defines a "Lightweight Directory Access Protocol" as:

> A network protocol designed to work on TCP/IP stacks to extract information from a hierarchical directory such as X.500. This gives users a single tool to comb through data to find a particular piece of information, such as a user name, an e-mail address, a security certificate, or other contact information (Ex. 2002, Pg. 5).

Accordingly, LDAP is a protocol for accessing and managing directory information services over a network. It enables applications to query, search, and

modify hierarchical directories that store data about users, groups, devices, or other organizational resources. Operating over TCP/IP, typically on port 389 for standard communication or port 636 for secure (SSL/TLS) communication, LDAP supports operations such as authentication, searching, and modifying entries. It is commonly used for user authentication, centralized access control, and resource management, integrating with systems like Microsoft Active Directory and OpenLDAP.

Therefore, as explained by Dr. Dr. Noubir "A POSITA would recognize that LDAP and DNS serve fundamentally different purposes and operate with distinct functionalities" (Ex. 2001, ¶44). Specifically, LDAP differs from DNS (in its purpose and functionality, focusing on managing and accessing directory-based information rather than resolving names to network addresses. LDAP is designed for centralized management of user accounts, groups, and permissions, enabling authentication and access control within enterprise environments. Unlike DNS, which primarily maps human-readable domain names to IP addresses for efficient routing, LDAP operates as a protocol for querying and modifying hierarchical directory structures, such as those found in Microsoft Active Directory or OpenLDAP. LDAP relies on TCP for reliable communication, typically over port 389 or port 636 for secure connections, and supports advanced features like secure authentication, role-based access, and integration with Single Sign-On (SSO) systems.

As a result, Forslow's mobile service manager 7 is not "a DNS server for the virtual network that is configured to receive a DNS request" and "return a network address associated with a network route director, a private network address

15

associated with a second device in the virtual network, and a virtual network address associated with the second device," as recited in claim 30 (Ex. 2001, ¶39). As a result, Forslow, alone or in combination with Leung, fails to teach or suggest every feature recited in claim 30.

Mehta does not cure the shortcomings of Forslow and Leung. The Office Action states, "to the extent it is determined that Forslow's mobile service manager is not a DNS server, it would have been obvious to a POSITA to implement it as a DNS server, as disclosed in Mehta, with the functionality to return the same addresses in the triplet disclosed in Forslow, as well as the public IP address for the route director, as disclosed in Mehta" (Non-Final Office Action, Pg. 31).

The Office Action identifies that Mehta's "FIG. 8 is a process flow diagram showing modifications to the server that can be used to provide a VPN client with the same enterprise address" (Non-Final Office Action, Pg. 23). However, Fig. 8 (reproduced below) shows a routine, implemented by an Address Proxy/Router within an Address Management Proxy System (AMPS), that handles data received from wired devices and facilitates communication with wireless devices by determining the private wireless address corresponding to the invoked public address. It verifies the validity of the address mapping using a TTL parameter, performs any necessary protocol or format conversions, and forwards the data to the wireless device's private address, ensuring compatibility with the wireless network's requirements (See Ex. 2001, ¶46).

Patent Owner: Intellectual Ventures I LLC
Application No.: 90/019,519



*Fig. 8*

However, in Mehta the sender only learned the address of the Proxy/Router, and it is the Proxy/Router that does the conversion. The sender is not aware of both the route director and the virtual/private address of the destination. Therefore, Mehta cannot "return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device," as recited in the Challenged Claims. Instead, Mehta teaches an architecture that is remarkably

17

similar to the Dynamic DNS system illustrated in FIG. 3 (reproduced below) of the

'785 Patent which is labeled as prior art (See Ex. 2001, ¶47).



Fig. 3
Prior Art

In fact, providing all three addresses would completely defeat Mehta's purpose

of reducing security risks. As explained by the Federal Circuit, "no suggestion to

modify a prior art device where the modification would render the device inoperable

for its intended purpose" (*Tec Air, Inc. v. Denso Mfg. ch., Inc.,* 192 F.3d 1353, 1360

(Fed. Cir. 1999)). Here, Mehta expressly states, "such addressing capability would

expose each device to further security risks, because each such device is part of a

publicly accessible network and it becomes more difficult to implement and enforce

security measures" (Mehta, ¶025). Therefore, the Office Action's proposed

modification would render the proposed combination inoperable for its intended purpose.

Instead, at most, Mehta allows a client to learn a temporary public IP address from a DNS server. The reference is wholly silent with regard to how to solve the problem of the current invention, which is how to route through a route director to the virtual address. Therefore, Mehta does not teach "a DNS server for the virtual network" that is configured to "return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device," as recited in the Challenged Claims.

Instead, the Office Action is impermissibly stitching together an obviousness rejection by not considering Mehta as a whole. Specifically, the Federal Circuit "explains that § 103 does not permit [an Examiner] to stitch together an obviousness finding from discrete portions of prior art references without considering the references as a whole" (*In re Enhanced Sec. Research, LLC*, 739 F.3d 1347, 1355 (Fed. Cir. 2014)). Accordingly, "[i]t is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art" (*In re Wesslau*, 353 F.2d 238 (CCPA 1965)).

Here, Mehta makes it clear that a POSITA would not want to "return a network address associated with a network route director, a private network address

**Patent Owner:** Intellectual Ventures I LLC
**Application No.:** 90/019,519

associated with a second device in the virtual network, and a virtual network address associated with the second device," as recited in claim 30 because sharing such information would compromise the security of the internal resources that Mehta is attempting to protect.

Therefore, Mehta, alone or in combination with Forslow and Leung, fails to teach or suggest every feature recited in claim 30. As a result, the Office Action's reliance on Leung, Forslow, and Mehta to reject claim 30 fails to demonstrate that the cited references, individually or in combination, teach or suggest "a DNS server for the virtual network configured to receive a DNS request" and "return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device," as explicitly recited claim 30. Leung lacks disclosure of the DNS server functionality required by the claims, Forslow's HTTPS-based communication does not equate to DNS operations, and Mehta's proposed modifications contradict its stated purpose of maintaining security, rendering the combination inoperable for its intended purpose. Furthermore, the Office Action improperly isolates discrete portions of the references without considering them as a whole, as required under § 103.

Therefore, a *prima facie* case of obviousness has not been established because the combination of the cited references fails to yield the features recited in claim 30.

For at least the foregoing reasons, it is respectfully submitted that claim 30 is allowable over Mehta, Forslow, and Leung.

8840448.4

**Patent Owner:** Intellectual Ventures I LLC
**Application No.:** 90/019,519

Claim 34 is directly dependent upon claim 30, and the Patent Owner submits the claim is allowable over the cited references of record based on at least its dependency.

Based on at least the arguments presented above, the withdrawal of the 35 U.S.C. §103 rejections of the claims are respectfully requested.

### C. The Office Action Improperly Conflates "Registration" and "Join" Processes, Failing to Establish That the Cited References Teach the Claimed Registration.

Claim 34, recites, in part:

> wherein the register module is further configured to receive the registration request from the agent that is installed on the device for data communication via the virtual network.

None of the cited references teach or suggest a registration model that is "configured to receive the registration request from the agent that is installed on the device for data communication via the virtual network," as recited in claim 34.

The Office Action states that "A POSITA would have understood that Leung's VPN clients would send registration requests via an associated agent" (Non-Final Office Action Pg. 41). However, the Office Action appears to be conflating a "registration request[1]" with a "join request."

---

[1] The '785 Patent will expire is several weeks, on or about February 13, 2025. In a reexamination proceeding involving claims of an expired patent, claim construction is controlled by the principles set forth by the court in *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005). Under *Phillips,* where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it

The '785 Patent expressly states:

> Registration in this context means registering a machine using a Member Agent or a Group Agent with the VCN Manager. Users may be required to install the Member Agent software. ('785 Patent, 17:10-12)
>
> ***
>
> The registration process is the first step that a user and machine go through with the VCN Manager before becoming a member of a virtual community. There are two phases to member registration: a registration request and a registration file request. Registration happens outside of the IPsec tunnels because at registration time no IPsec tunnel exists for the user registering ('785 Patent, 1740-42).

Accordingly, the '785 Patent defines registration as the process by which the machine and the user are registered with the virtual community. Specifically, the Applicant has acted as their own lexicographer and provided an express definition of registration by stating, "Registration in this context means registering a machine using a Member Agent or a Group Agent with the VCN Manager."

In contrast, the '785 Patent explains the Join/ Leave Process as the following:

> Once a user is registered, the user can join the VCN. Once joined, the user is a member of the VCN. Joining allows the user to let the VCN Manager and other members know that the user/member is on-line and available to communicate. The Join protocol runs between a Member Agent and the VCN Manager to establish a session key with the Manager, authenticate to the Manager, and make use of connections via the Route Directors in the community.

---

would otherwise possess, "the inventor's lexicography governs." Id., at 1316. Thus, to the extent the reexamination proceedings continue beyond February 13, 2025, claim terms such as "registration" must be construed as defined in the specification.

> The Member Join process is illustrated in FIG. 13. There are two
> phases to the Join operation: phase one is an Initialize Request
> and phase two is the actual Join. At join time, the IPSec tunnel
> for secure communication is not established, so the first few join
> packets are sent outside the IPSec tunnel ('785 Patent, 20:6-18).

Accordingly, the '785 Patent teaches that join/leave process is separate process from the registration process. Specifically, the join/leave process is utilized to establish the connection subsequent to the user and the machine being registered by the registration process.

The Office Action has proffered no evidence that Leung, Forslow, or Mehta, alone or in combination, teach "registering a machine using a Member Agent or a Group Agent with the VCN Manager." Instead, the Office Action cites to Leung's "access request" (Non-Final Office Action, Pg. 39), which is at most analogous to the "join" aspect of the join/leave process in the '785 Patent, as opposed to the registration process which is the subject of claim 34. Accordingly, the Office Action has not established a prima case of obviousness.

To establish a *prima facie* case of obviousness, "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" (*KSR Int'l v. Teleflex Inc.*, 127 S. Ct. 1727, 1741 (2007)). Therefore, the Federal Circuit Court of Appeals requires "record evidence to support an assertion that the structural features of claims ... were known prior art elements" (*K/S HIMPP v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1365 (Fed. Cir. 2014)). And although "'common sense' can be invoked, even potentially to supply a limitation missing from the prior art, it must still be supported by evidence and a reasoned explanation"

(*Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1363 (Fed. Cir. 2016)). As a result, a *prima facie* case of "[o]bviousness requires a suggestion of all limitations in a claim" (*CFMT, Inc. v. YieldUp Int'l Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003)).

Here, the Office Action has offered no evidence that the cited references teach or suggest a registration model that is "configured to receive the registration request from the agent that is installed on the device for data communication via the virtual network," as recited in the Challenged Claim. As most, the Office Action has suggested that the cited references perform a join function.

Therefore, a *prima facie* case of obviousness has not been established because the combination of the cited references fails to yield the features recited in the claims.

For at least the foregoing reasons, it is respectfully submitted that claim 34 is allowable over Mehta, Forslow, and Leung.

Based on at least the arguments presented above, the withdrawal of the 35 U.S.C. §103 rejections of the claims are respectfully requested

**Patent Owner:** Intellectual Ventures I LLC
**Application No.:** 90/019,519

## IV.    Conclusion

In view of the foregoing, the Patent Owner respectfully request reconsideration. The Patent Owner submits that the U.S. Patent No. 7,949,785, including claims 1-90, is in condition for confirmation of patentability and a solicits a notice to that effect.

Respectfully submitted,

Intellectual Ventures I LLC

By____/Brandon R. Theiss/_____
Brandon R. Theiss
Registration No. 70,507